FIRST FEDERAL SAVINGS BANK OF HEGEWISCH, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 93–162C.

United States Court of Federal Claims.

Originally Filed July 3, 2002.

Reissued for Publication July 8, 2002.

Theodore A. Shapero, Chicago, Illinois, attorney of record for plaintiff and Mark A. Rabinowitz, co-counsel, Chicago, Illinois.

Edward Sullivan, Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director. Jeffrey T. Infelise, Trial Attorney.

### OPINION and ORDER [1]

FUTEY, Judge.

This *Winstar*-related case is before the court on the parties' cross-motions for summary judgment on contractual liability, plaintiff's motion to dismiss defendant's counterclaims and affirmative defenses, and defendant's cross-motion for summary judgment as to its counterclaims and affirmative defenses. Defendant's counterclaims are based on the special plea in fraud statute and rescission.

With respect to contractual liability, plaintiff maintains that agreements it made with defendant during plaintiff's acquisition of a failing thrift created a contract that allowed plaintiff to utilize certain favorable accounting principles. Plaintiff maintains defendant breached this contract when it enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Not-

---

1. This opinion was originally filed under seal on July 3, 2002, pursuant to a protective order issued June 7, 2001. The parties agreed to the withdrawal of the protective order in a telephon-ic conference held on July 8, 2002. This Opinion and Order, therefore, is being reissued for publication as of this date.

withstanding the United States Supreme Court's (Supreme Court) decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), defendant argues it never entered into a contract with plaintiff because their negotiations were regulatory in nature, not contractual. Defendant also alleges that plaintiff's actions pre- and post-FIRREA did not reflect a contractual relationship between the parties.

In addition, defendant asserts plaintiff's complaint should be dismissed because plaintiff perpetrated fraud against the government for a nine-year period. Said fraud is premised on a defalcation committed by one of plaintiff's employees. Defendant also asks the court to rescind any contract it had with plaintiff and to order plaintiff to return the $2 million it received as assistance when it acquired the failing thrift. Plaintiff seeks dismissal of defendant's counterclaims because defendant filed them after the statute of limitations expired. Plaintiff also contends defendant cannot satisfy the requisite elements necessary for proving fraud and rescission. Moreover, plaintiff believes defendant's affirmative defenses should be stricken because they are wholly conclusory.

### Factual Background

Plaintiff is a savings and loan association located in Chicago, Illinois, the accounts of which are insured by the Savings Association Insurance Fund (SAIF) as administered by the Federal Deposit Insurance Corporation (FDIC). Prior to May 1982, plaintiff was a state-chartered savings and loan institution, which operated on the southeast side of Chicago. In May 1982, plaintiff became a federally insured, mutual savings and loan association or "thrift."

As this case is considered a *"Winstar-*related" case, it is unnecessary to revisit the history of the savings and loan crisis. This has been exhaustively done in prior opinions

such as *Winstar* itself. *See, e.g., Winstar,* 518 U.S. at 843–856, 116 S.Ct. 2432; *Bluebonnet Sav. Bank, F.S.B. v. United States,* 47 Fed.Cl. 156, 158 (2000) (*Bluebonnet II*), *aff'd, in part,* 266 F.3d 1348, 1354–55 (Fed.Cir. 2001). Only the facts relevant to this particular case, therefore, are set forth here.

### I. The Lansing Acquisition

Lansing Federal Savings & Loan Association (Lansing) was a federally chartered mutual association located in Lansing, Illinois. In 1982, Lansing was a failing thrift institution insured by the Federal Savings and Loan Insurance Corporation (FSLIC). During the summer of 1982, a FSLIC supervisory agent contacted at least ten associations in the Chicago area, including plaintiff, concerning a possible assisted merger with Lansing. Plaintiff's attorney sent the supervisory agent a letter dated May 25, 1982, expressing plaintiff's interest in merging with Lansing on the condition that: (1) the acquisition be accomplished under the purchase method of accounting and Lansing's assets be "marked to market;"[2] (2) for a period of thirty-five years, the Federal Home Loan Bank Board (FHLBB) would forbear from including operating losses on acquired assets, capital losses upon disposition of acquired assets and acquired scheduled items, and liabilities for the net worth calculation; (3) for a period of one year, FHLBB would forbear from including Lansing's liquidity deficiency and aggregate net withdrawals in the liquidity calculation; and (4) for a period of five years, FSLIC would indemnify plaintiff for expenses and attorney's fees incurred in connection with any litigation challenging the merger or arising from Lansing's undisclosed liabilities or scheduled items. After further discussions with FSLIC, plaintiff submitted a bid to FHLBB for the proposed acquisition of Lansing on August 23, 1982. The cover letter attached to this bid stated, in pertinent part:

---

**2.** In 1982, the rules established by applicable generally accepted accounting principles (GAAP) provided that, in mergers and acquisitions which used the purchase method of accounting, the book value of the assets and liabilities of an acquired thrift institution should be adjusted to fair market value or "marked to market" at the time of the acquisition. GAAP also provided that

any excess in the cost of the acquisition (which included any liabilities assumed by the acquirer) over the fair market value of the acquirer assets should be separately recorded on the acquirer's institution's books as "goodwill"-an intangible, non-earning asset that may be amortized on a straight-line basis over a period of up to forty years.

First Federal Savings of Hegewisch hereby submits its bid to acquire Lansing Federal Savings and Loan Association, utilizing purchase accounting method of acquisition and FSLIC capital assistance.[3]

On December 13, 1982, plaintiff entered into a merger agreement (Merger Agreement) with Lansing. On December 16, 1982, FSLIC's Director, H. Brent Beesley, issued a memorandum to FHLBB recommending the approval of the merger between Lansing and plaintiff. FHLBB approved the merger by resolution on December 20, 1982. Plaintiff entered into an assistance agreement (Assistance Agreement) with FSLIC and Lansing on December 30, 1982. The effective date of the merger was January 7, 1983.

The Assistance Agreement, in Paragraph D of the Recitals, stated:

> The CORPORATION [FSLIC] has decided, pursuant to § 406(f) of the National Housing Act, as amended, 12 U.S.C. § 1729(f), to provide financial assistance as set forth in this Agreement, having determined that the MERGING ASSOCIATION [Lansing] is in danger of default and that the amount of such assistance would be less than the losses the CORPORATION would sustain upon the liquidation of the MERGING ASSOCIATION through a receivership accompanied by the payment of insurance of accounts.[4]

Section 19 added, in part:

> This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties ... in connection herewith, excepting only the Merger Agreement and any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board or the CORPORATION, provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Merger Agreement, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights,

privileges, duties, obligations, and liabilities of the CORPORATION are concerned.[5]

Section 19 of the Assistance Agreement contained an integration clause which incorporated by reference the Merger Agreement, certain contemporaneous resolutions issued by FHLBB, and a letter from FHLBB to plaintiff that guaranteed certain accounting forbearances with respect to the intangible assets that could be recognized in the transaction.

On December 30, 1982, FHLBB adopted Resolution No. 82–891, which included, in pertinent part:

> for purposes of regulatory reporting, Hegewisch shall account for the merger as a purchase using one of the following methods of accounting: 1) regulatory accounting principles prescribed for insured institutions, in which case any goodwill or similar item resulting from the merger shall be amortized over a period of no more than 35 years under the straight line method; or 2) generally accepted accounting principles, consistently applied, in use in the savings and loan industry at the time of the bid proposal on August 23, 1982.
>
> . . . .
>
> RESOLVED FURTHER, That the Bank Board finds that the merger of Lansing with and into Hegewisch is instituted for supervisory reasons.[6]

In addition, FHLBB Memorandum 31b expressly provided that the goodwill resulting from the merger could be recognized as an asset subject to amortization.

Plaintiff elected to use the purchase method of accounting for the merger with Lansing. Plaintiff's auditors at the time, Ernst & Whinney, concluded that Lansing's liabilities exceeded its assets by $8,543,277 on a marked to market basis. Pursuant to the purchase method of accounting, therefore, plaintiff recorded $8,543,277 in supervisory

---

**3.** Defendant's Cross–Motion For Summary Judgment As To Counterclaims And Affirmative Defenses (Def.'s Cross–Mot. on Countercl.), Appendix (App.) at 11.

**4.** *Id.* at 104–05.

**5.** *Id.* at 139.

**6.** *Id.* at 147–48.

goodwill, which it planned to amortize over thirty-five years on a straight line basis. Plaintiff actually amortized the supervisory goodwill from 1983 until the enactment of FIRREA on August 9, 1989.

When enacted, FIRREA: (1) abolished FSLIC and transferred its functions to other agencies; (2) created SAIF, managed by FDIC; (3) abolished FHLBB; and (4) created the Office of Thrift Supervision (OTS) in the Department of Treasury. It also provided, in part, that tangible capital cannot include supervisory goodwill, and that only limited amounts of core capital may consist of supervisory goodwill. These amounts would be phased out by 1994. It further stated that supervisory goodwill must be amortized for a period not to exceed twenty years.

On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA that excluded supervisory goodwill from capital for regulatory reporting purposes. As a result of the provisions of FIRREA and the OTS capital regulations, plaintiff argues it can no longer satisfy the mandatory minimum capital requirements and cannot come into compliance with said requirements in the foreseeable future.

## II. David Orchowski's Defalcation

At the time of the Lansing negotiations, David J. Orchowski was the son-in-law of plaintiff's chairman of the board, Vincent Ginalski, and the husband of the president, Ann Capanna. From 1986 to 1991, he served as plaintiff's chief financial officer and executive vice president. He also served as vice president, controller and treasurer of plaintiff for several years prior to 1986.

In September 1991, Mr. Orchowski turned himself in to the Federal Bureau of Investigation (FBI) in Chicago, Illinois, admitting that he had defrauded plaintiff over a period of nine years, beginning in mid–1982. His fraudulent activity began several months prior to FSLIC's execution of the Assistance Agreement and the completion of FHLBB's September 1982 regulatory examination of plaintiff. The total amount he embezzled during his fraud scheme was approximately

$100,000. He also misappropriated other funds, primarily through his activities involving the making of unauthorized loans. In addition, he altered existing loans and paid extortion to borrowers who threatened to reveal his unlawful activities. Plaintiff's total losses from Mr. Orchowski's actions neared $10 million. Plaintiff subsequently recovered all of these losses from the customers involved, bonding company, auditors, and Mr. Orchowski.

Mr. Orchowski was charged in a criminal information proceeding with a violation of 18 U.S.C. § 1344 (1990 Supp.) for one count of bank fraud. He plead guilty in 1992 to willfully misapplying funds belonging to, and under the custody and control of, plaintiff. In conjunction with his guilty plea, he entered a plea agreement where he admitted the following: (1) beginning in approximately June 1982, he made no less than sixty unauthorized loans with funds belonging to plaintiff; (2) many of the loans were extended to individuals who had applied to plaintiff for loans but had been turned down due to reasons relating to credit risk, loan purpose, or plaintiff's loan policies; (3) he failed to obtain properly executed loan documentation for many of the unauthorized loans; and (4) he failed to perfect plaintiff's security interest in collateral for the loans. As a result of his guilty plea, he was sentenced to thirty-one months in prison and ordered to pay restitution to plaintiff. On November 9, 1991, plaintiff filed a civil action against Mr. Orchowski alleging, among other things, a breach of fiduciary duty.

Mr. Orchowski's activities caused the OTS to implement several enforcement actions against him. For example, the OTS issued a "Stipulation and Consent to Issuance of Order of Prohibition" to Mr. Orchowski barring him from further participation, in any manner, in plaintiff's affairs. He also was prohibited from acting as a director or officer in any other financial institution without the prior written approval of the Regional Director of the Central Region of the OTS. In addition, the OTS issued a Cease and Desist Order (C & D Order) against plaintiff[7] requiring it to complete a comprehensive analy-

---

7. The C & D Order was issued with plaintiff's consent.

sis and assessment of its management structure and staffing requirements. The OTS required this study because, after conducting a formal investigation of the defalcation, it concluded that a lack of proper oversight by the board of directors and plaintiff's senior management contributed, in part, to Mr. Orchowski's ability to carry out his fraud over a sustained period of time. The OTS also cited the negligence of plaintiff's accountant, Deloitte & Touche, as a significant contributing factor in plaintiff's failure to detect the defalcation.

## III. Pending Litigation

Plaintiff filed a complaint on March 22, 1993, listing seven counts against the government including breach of contract, Fifth Amendment takings and due process violations, as well as requesting damages and restitution. On October 29, 1997, plaintiff filed a short-form motion for partial summary judgment in accordance with the court's omnibus case management order (CMO). Defendant filed a motion to dismiss Counts II, III, IV, V, VI and VII on November 15, 1999, and filed a cross-motion for summary judgment with respect to Count I on December 6, 1999. There is also a series of short briefs that were filed in response to the court's order to show cause why summary judgment should not be entered in this case, in light of the court's decision in *California Fed'l Bank, FSB v. United States*, 39 Fed.Cl. 753 (1997). The court appended an order to that opinion requiring defendant to respond in all cases where the plaintiffs had filed a motion for summary judgment. This generated a series of responsive briefs.

Judge Loren Smith transferred this case to the undersigned judge on December 15, 2000. In a departure from the CMO, which asked defendant to not file answers and counterclaims in the *Winstar* cases until after the short-form motions for partial summary judgment were decided, the court allowed defendant to file its answer and counterclaim in an order dated June 7, 2001. Defendant filed this document under seal on June 13, 2001. Defendant's counterclaim is based on the defalcation involving approximately $10 million in unauthorized loans and misappropriations committed by Mr. Orchowski. Defendant's counterclaim contains two counts—Count I is a special plea in fraud claim based on 28 U.S.C. § 2514 (1994) and Count II is a claim for rescission of the Assistance Agreement in response to the alleged fraud. On August 8, 2001, plaintiff filed a motion to dismiss Counts I and II of defendant's counterclaim. Defendant responded by filing a cross-motion for summary judgment on Counts I and II.

Also on August 8, 2001, plaintiff moved for leave to amend its complaint to include a reliance damages theory.[8] The court granted this request on October 17, 2001. Plaintiff filed its first amended complaint on January 16, 2002, to include factual allegations necessary to establish reliance damages for its breach of contract claim. The damages that plaintiff now seeks are: (1) lost profits; (2) the costs of substituting replacement capital for the supervisory capital it lost when defendant breached the contract; (3) restitution of defendant's benefit or restitution of plaintiff's cost of performance under the contract; and (4) reliance damages.

Defendant filed an answer to plaintiff's first amended complaint on February 12, 2002. This document included the same counterclaims defendant set forth in its first answer. On March 1, 2002, plaintiff filed a motion to dismiss Counts I and II of defendant's counterclaim. This motion was just a reiteration of plaintiff's previous motion to dismiss these counts, which it filed on August 8, 2001. An oral argument addressing the breach of contract issues and defendant's counterclaims was held on May 15, 2002, in Washington, D.C.

## Discussion

The court presently has before it plaintiff's motion for partial summary judgment on liability, defendant's corresponding cross-motion, plaintiff's motion to dismiss the two counts of defendant's counterclaim, and defendant's corresponding cross-motion for summary judgment as to its counterclaims

---

8. Plaintiff also sought permission to amend its expert report, which the court allowed.

and affirmative defenses.[9] The two main issues are contractual liability and defendant's special plea in fraud claim. As this court has previously discussed, "it is ultimately impossible to divorce the two." *Anderson v. United States*, 47 Fed.Cl. 438, 442 (2000). They are intertwined because the scope of the contract is critical to the issue of whether the court should grant defendant's summary judgment motion based on fraud. *Id.*

I. Contractual Liability

■ Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the opposing party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show that there is an absence of evidence to support the opposing party's case, the burden then shifts to the opposing party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992)).

Plaintiff maintains the Merger Agreement, Assistance Agreement and certain documents incorporated by the integration clause formed a contractual relationship with defendant. Plaintiff contends its bid to merge with Lansing specifically proposed to FHLBB that plaintiff would use the purchase method of accounting and would record supervisory goodwill for the merger. Plaintiff asserts that throughout the entire negotiation process with Lansing, FSLIC and FHLBB it was understood and articulated, orally and in writing, that plaintiff would be able to record as supervisory goodwill the amount by which the market value of Lansing's liabilities exceeded the market value of its assets. Plaintiff argues it was also agreed that it could amortize this goodwill over a long period of time, such as thirty to forty years, as reflected in the bid. Plaintiff maintains that no acquirer would have merged with Lansing without financial assistance from FSLIC and FHLBB. In addition, plaintiff asserts defendant is raising arguments that the Supreme Court specifically rejected in *Winstar*.

Defendant contends the Assistance Agreement, by its terms, did not promise that purchase method accounting could be used or

---

9. Defendant's motion to dismiss Counts II–VII of plaintiff's complaint is not addressed in this opinion because the briefing is not complete.

Arguments relating to Counts III–VII have been stayed until the court rules on plaintiff's breach of contract claim.

that special regulatory treatment would be afforded to plaintiff for the supervisory goodwill that resulted from the Lansing acquisition. Defendant also asserts the Assistance Agreement did not provide plaintiff with direct cash assistance from FSLIC. Instead, FSLIC agreed that plaintiff could debit certain amounts from a special reserve account established by FSLIC to offset current or future liabilities associated with Lansing's operations. Plaintiff debited nearly $2 million from this account. Defendant further maintains that all documents integrated into the Assistance Agreement, such as the Merger Agreement and certain resolutions by FHLBB, did not contain any contractual guarantees to plaintiff with respect to the purchase method of accounting or the regulatory treatment of supervisory goodwill.

A. *The Winstar scenario*

Since this case has been characterized as *Winstar*-related, it is necessary to review the Supreme Court's decision in that seminal case.[10] Three separate causes of action were heard by the Supreme Court at that time, with *Winstar* serving as the lead case. Glendale Federal Bank, FSB (Glendale) and The Statesman Group, Inc. were the two other thrifts involved. *Winstar*, 518 U.S. at 858, 116 S.Ct. 2432. Plaintiff asserts the facts of Glendale's acquisition are most closely related to the present case.[11]

First Federal Savings and Loan Association of Broward County (Broward) approached Glendale in September 1981 about a possible merger. *Id.* at 861, 116 S.Ct. 2432. At the time, Broward had liabilities exceeding its assets by over $734 million. *Id.* Glendale was both profitable and well-capitalized, with a net worth of $277 million. *Id.* After preliminary negotiations, Glendale submitted a merger proposal to FHLBB that "assumed the use of the purchase method of accounting to record supervisory goodwill arising from the transaction, with an amortization period of 40 years." *Id.* FHLBB ratified the merger's "Supervisory Action Agreement" (SAA), on November 19, 1981. *Id.*

The SAA said nothing about supervisory goodwill, but it did contain an integration clause incorporating contemporaneous resolutions and letters, as well as the merger agreement. *Id.* One of the incorporated documents was Resolution 81–710, which referred to two additional documents including: (1) a letter from Glendale's accountant identifying the use of goodwill and amortization periods to be recorded in Glendale's books and (2) a stipulation that goodwill would be amortized in accordance with Memorandum 31b. *Id.* Memorandum 31b allowed Glendale to use the purchase method of accounting and to recognize goodwill as an asset subject to amortization. *Id.*

The Supreme Court in *Winstar* concluded that these documents were enough to create a contractual relationship between Glendale and the government. Indeed, the court commented that "[w]e accordingly have no reason to question the Court of Appeal's conclusion that 'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.'" *Id.* at 864, 116 S.Ct. 2432 (quoting *Winstar*, 64 F.3d 1531, 1540 (Fed.Cir.1995)); *see also Bluebonnet Sav. Bank, F.S.B. v. United States*, 43 Fed.Cl. 69 (1999) (*Bluebonnet I*).

The Glendale acquisition, therefore, consisted of four basic elements that the Supreme Court believed formed a contractual relationship: (1) a merger proposal that indicated purchase method accounting to record supervisory goodwill; (2) an assistance agreement, which said nothing about supervisory goodwill; (3) an integration clause in the assistance agreement that incorporated contemporaneous resolutions, letters, and the merger agreement; and (4) the actual contemporaneous resolutions and letters that indicated purchase method accounting for supervisory goodwill and amortization periods.

---

10. The court believes it is no longer necessary, however, to set forth a dissertation of the complete circumstances of *Winstar* and its progeny, as this analysis has been explained numerous times by other opinions of this court. *See, e.g.,* *Bluebonnet II*, 47 Fed.Cl. at 158.

11. Transcript of Oral Argument (Tr.) at 28.

All four of these elements exist in the present case.

Specifically, plaintiff sent FSLIC's supervisory agent a letter concerning the merger that expressed plaintiff's desire to use the purchase method of accounting. Plaintiff then entered into an assisted transaction with FSLIC and Lansing. The Assistance Agreement did not specifically mention supervisory goodwill, however, Section 19 contained an integration clause that incorporated by reference the Merger Agreement, certain contemporaneous resolutions issued by FHLBB, and a letter from FHLBB to plaintiff guaranteeing certain accounting forbearances. One of the FHLBB resolutions included was No. 82–891, which allowed plaintiff to use either regulatory accounting principles or GAAP. Plaintiff elected to use the purchase method of accounting under GAAP so it could record $8,543,277 in supervisory goodwill, which it planned to amortize over thirty-five years on a straight-line basis. This supervisory goodwill helped plaintiff satisfy the mandatory regulatory capital requirements. But for defendant's enactment of FIRREA, plaintiff could have continued to satisfy these requirements. The court believes this case is exactly like the scenario set forth in *Glendale* and explained in *Winstar*.[12]

### B. Defendant's attempt to distinguish this case from the Winstar scenario

Defendant provides an extensive list of reasons, however, as to why plaintiff did not enter a contractual relationship with the government in spite of the *Winstar* decision: (1) the government did not make contractual guarantees; (2) the government's actions refute the notion of a contract; (3) regulatory action alone does not create contractual rights; (4) plaintiff did not evince contractual intent; (5) plaintiff's actions prior to FIRREA showed no indication of a contractual relationship; (6) plaintiff's actions subsequent to FIRREA revealed no indication of a contractual relationship; (7) it was not irrational for plaintiff to acquire Lansing absent a contract with the government; and (8) any agreement with the government terminated before the enactment of FIRREA.[13] Some of these arguments were expressly rejected by the Supreme Court in *Winstar*, or by decisions of the United States Court of Appeals for the Federal Circuit (Federal Circuit). *See, e.g., California Fed'l Bank*, 39 Fed.Cl. at 762–63 (rejecting the argument that any contractual relationship terminated when the assistance agreement expired, which was prior to FIRREA). Indeed, defendant admits that some of the issues it raises "may be deemed decided by previous decisions of this Court."[14] Because the

12. Defendant admitted in its response to the court's order to show cause filed June 10, 1998, that the court's December 22, 1997 opinion addressing cross-cutting issues could be interpreted as holding that a contract regarding the use of goodwill to satisfy FHLBB's minimum capital requirements is created by: (1) a document submitted to FHLBB or a supervisory agent that mentions purchase method accounting and (2) a second document generated by the government that recognizes the use of the purchase method of accounting to record the transaction. Response Of The United States To The Court's Order To Show Cause at 20. If this is the correct interpretation, defendant conceded that "[g]iven that documents of this type exist in this case, we can offer no reason why, if our interpretation of the Court's ruling is correct, the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements exists in this case." *Id.* Defendant expressed at oral argument, however, that then Chief Judge Loren Smith coerced it into making this concession so it should be ignored. Tr. at 37. Indeed, defendant asked the court to overturn Judge Smith's previous deci-

sion *binding this case*. *Id.* at 38. Although decisions of the Court of Federal Claims in other cases are not precedential, the court will adhere to the rulings made by a judge previously assigned to this specific case. Thus, the court will not attempt to revisit the conclusions reached by Judge Smith.

13. Defendant also attempted to raise new arguments in its proposed findings of uncontroverted fact in support of its cross-motion for summary judgment as to liability filed on April 15, 2002. Indeed, defendant seems to have misunderstood the court's request for findings of fact on liability, because defendant used this opportunity to basically file another brief, under the guise of statements of fact, setting forth alternative arguments against plaintiff's claim. The court will mention these new issues only briefly, as they were not properly presented to this court. In addition, the court finds the arguments unpersuasive.

14. Defendant's Opposition To Plaintiff's Short-Form Motion For Partial Summary Judgment On Liability, And Defendant's Cross–Motion For Partial Summary Judgment (Def.'s Mot.) at 10 n.5.

court believes the present case fits squarely within the *Winstar* scenario, the court will only briefly address defendant's arguments and its attempt to relitigate what the Supreme Court has already established.

First, defendant maintains that nowhere in the four corners of the Assistance Agreement, the Merger Agreement, and the documents integrated into the Assistance Agreement is plaintiff promised the right to count supervisory goodwill for regulatory capital purposes and to use the purchase method of accounting. Instead, defendant argues that all it guaranteed was that plaintiff could debit FSLIC's special reserve account for: (1) capital loss coverage on real estate operations of Lansing up to $1.6 million; (2) capital loss coverage on Lansing's service corporation investment up to $1.4 million; and (3) $100,000 maximum coverage for undisclosed liabilities of Lansing. Defendant seems to ignore, however, Resolution 82–891 and FHLBB Memorandum 31b. Resolution 82–891, which was incorporated into the Assistance Agreement, states that regulatory accounting principles allow goodwill to be amortized over thirty-five years. Memorandum 31b expressly provides that the goodwill resulting from the merger could be recognized as an asset subject to amortization.[15] The Supreme Court concluded in *Winstar* that Memorandum 31b permits the use of "the purchase method of accounting and to recognize goodwill as an asset subject to amortization." 518 U.S. at 862, 116 S.Ct. 2432. Defendant's argument is therefore unconvincing.

Defendant also contends that its promise to permit plaintiff to use supervisory goodwill for regulatory capital compliance purposes, was regulatory in nature, not contractual, because there are no internal memoranda from the regulators discussing any contracts with plaintiff. Defendant adds that the performance of a regulatory function does not create a contract. The Supreme Court expressly rejected this argument in *Winstar* as "fundamentally implausible" because the integration clause in the Assistance Agreement incorporated the FHLBB resolutions and letters "not as statements of background rules, but as part of the 'agreements and understandings' between the parties." *Id.* at 863, 116 S.Ct. 2432. The Supreme Court also rejected defendant's additional argument that plaintiff assumed the risk of any change in regulatory capital requirements. The Supreme Court stated "it would have been irrational ... for [plaintiffs] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." *Id.* at 863, 116 S.Ct. 2432. The court does not agree with defendant's argument.

In addition, defendant maintains that plaintiff's actions pre- and post-FIRREA did not evince contractual intent or a contractual relationship. This argument too is unpersuasive because plaintiff made clear at the time of the negotiations that it wanted to use the purchase method of accounting and that the recording of supervisory goodwill was key to the transaction. After the merger, plaintiff began amortizing the goodwill, and defendant allowed plaintiff to treat it as an asset when calculating regulatory capital.[16] Also, contrary to defendant's assertions, plaintiff's conversion from a federal savings bank to a state-chartered bank four years after the enactment of FIRREA is not convincing evidence that plaintiff had no contractual relationship with defendant.[17]

---

15. Memorandum 31b was not specifically integrated into the Assistance Agreement, however, its applicability does not depend upon express incorporation. By its own terms, it automatically applies to "accounting, under generally accepted accounting principles, for goodwill arising in the acquisition of a savings and loan association." Defendant's Reply To Plaintiff's Response In Opposition To Government's Cross–Motion For Summary Judgment Regarding Count I Of Plaintiff's Complaint, Exhibit F (Memorandum 31b), at 1.

16. At oral argument, defendant raised the issue that plaintiff did not submit a letter explaining which accounting method it was going to follow, as required, so it is precluded from claiming there was a contract. Tr. at 50. This specific argument was rejected by then Chief Judge Smith in his common issue decision filed on December 22, 1997, which governs this case. *California Fed'l Bank*, 39 Fed.Cl. at 770. The court agrees with Judge Smith's ruling.

17. As plaintiff's counsel explained at oral argument, by the time plaintiff converted into a state-

With respect to the rationality of plaintiff's acquisition of Lansing, defendant asserts that it was completely reasonable for plaintiff to enter the transaction without a contractual commitment from defendant for the regulatory treatment of goodwill. Defendant emphasizes the special reserve account established by FSLIC and the small amount of goodwill-a "mere" $8 million-to support this claim that the Lansing purchase was attractive even without contractual guarantees. It seems, however, that the reserve account served only as a means of reimbursement for any losses plaintiff experienced from the disposition of Lansing's assets. It was not simply a "direct cash payment" that lowered the risk of the transaction, thus making the acquisition more appealing as defendant has argued.

Also, defendant's claim that the Lansing transaction did not result in much supervisory goodwill, and therefore, did not create a significant risk to plaintiff ignores the facts of this particular case. The "mere" $8 million may seem small and insignificant compared to the approximately $798 million of supervisory goodwill in *Glendale Federal Bank, FSB v. United States,* 43 Fed.Cl. 390, 405 (1999). The acquiring bank in *Glendale,* however, was large with a net worth of $277 million at the time of its merger with a failing thrift. *Id.* at 393. Prior to the merger in the present case, plaintiff had a net worth of only approximately $2.6 million, and it was a small, family-owned financial institution. The amount of supervisory goodwill at stake should be considered in light of the size and assets of the acquiring institution. What may seem insignificant to a large bank like Glendale could be deemed quite expensive and a significant risk for a small institution like plaintiff. Defendant's argument is therefore unconvincing.[18]

Finally, defendant contends that any contractual relationship between the parties terminated in 1985 when the Assistance Agree-

ment expired. Defendant admits, however, that this particular argument "may conflict with previous decisions of this Court in other cases."[19] Defendant is correct that this argument has been previously rejected. *See Winstar,* 64 F.3d at 1542; *California Fed'l Bank,* 39 Fed.Cl. at 762–63. Defendant's promise to permit plaintiff to treat goodwill as a capital asset was not founded solely upon the Assistance Agreement, because it was also reflected in the FHLBB resolutions. The contractual relationship, therefore, did not end with the termination of the Assistance Agreement.

Defendant's attempt to distinguish this case from the *Winstar* scenario fails. The circumstances of the Lansing acquisition are exactly like the transaction involved in *Glendale.* The court concludes that the present case falls within the *Winstar* scenario and that the parties were bound by a contract premised on the Assistance Agreement, the Merger Agreement, and the documents integrated into the Assistance Agreement, including the FHLBB resolution. Said contract allowed plaintiff to use the purchase method of accounting to record supervisory goodwill and to include said goodwill for regulatory capital compliance purposes.

## II. Defendant's Counterclaims

Plaintiff and defendant, therefore, were bound by a contractual relationship. Defendant is liable for breaching this contract when it enacted FIRREA unless it can establish that Mr. Orchowski's fraudulent activities preclude plaintiff from asserting a claim against the government. Defendant raises two counterclaims based on Mr. Orchowski's actions: (1) special plea in fraud and (2) rescission. Defendant also asserts numerous affirmative defenses it believes justify dismissing plaintiff's complaint. Plaintiff has responded by filing a motion to dismiss the

---

18. At oral argument, defendant's counsel tried very hard to characterize the Lansing acquisition chartered bank it could no longer use supervisory goodwill because FIRREA had phased it out. Tr. at 17. Defendant's argument that plaintiff would not have converted into a state-chartered bank if the goodwill had any value is a complete "red herring."

as a "sweetheart deal" with no risk to plaintiff. Tr. at 42. After reviewing the facts of this case, the court agrees with plaintiff that the acquisition posed a significant risk and that it would not have been rational for plaintiff to acquire Lansing without the contractual guarantees governing the treatment of goodwill.

19. Def.'s Mot. at 23 n.12.

special plea in fraud claim because the statute of limitations has expired. Plaintiff also believes that both of defendant's counterclaims fail to state a claim upon which relief may be granted. With respect to the affirmative defenses, plaintiff asks the court to strike them because they are not sufficiently plead and are wholly conclusory. Defendant has cross-moved for summary judgment on its counterclaims and affirmative defenses.

### A. *Plaintiff's motion to dismiss*

Plaintiff moves to dismiss Count I of defendant's counterclaims for lack of subject-matter jurisdiction[20] and both Counts for failure to state a claim upon which relief may be granted. The distinction between the two has been established by the Federal Circuit. *See Gould, Inc. v. United States,* 67 F.3d 925 (Fed.Cir.1995); *Spruill v. Merit Systems Protection Board,* 978 F.2d 679 (Fed.Cir. 1992); *Do–Well Machine Shop, Inc. v. United States,* 870 F.2d 637 (Fed.Cir.1989). "A dismissal for lack of subject matter jurisdiction essentially means that the subject-matter of the dispute is one that the court is not empowered to hear and decide." *McAfee v. United States,* 46 Fed.Cl. 428, 431 (2000) (citing *Gould, Inc.,* 67 F.3d at 929). "In contrast, a dismissal for failure to state a claim is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief." *Id.* In order to determine whether the allegations state a cause of action upon which relief may be granted, and to decide issues of fact arising in the controversy, the court must assume jurisdiction over a claim. *Id.* (citing *Do–Well Machine Shop, Inc.,* 870 F.2d at 639.).

In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the court must accept as true the counterclaim's undisputed factual allegations and construe them in a light most favorable to defendant. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States,* 29 Fed. Cl. 684, 686 (1993). If the undisputed facts reveal any possible basis on which defendant may prevail, the court must deny the motion. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir.1991). "The court should 'look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.' " *Farmers Grain,* 29 Fed. Cl. at 686 (citing *Raymark Industries, Inc. v. U.S.,* 15 Cl.Ct. 334, 335 (1988)). Defendant bears the burden of establishing subject-matter jurisdiction for its counterclaims. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); *Rocovich,* 933 F.2d at 993.

The court will dismiss defendant's counterclaims under RCFC 12(b)(6) for failure to state a claim upon which relief may be granted only if it appears beyond a doubt that defendant has not alleged facts sufficient to support its claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mostowy v. United States,* 966 F.2d 668, 672 (Fed.Cir.1992). Also, the court must accept as true the counterclaim's undisputed factual allegations and should construe them in a light most favorable to defendant. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). Furthermore, all that is required to withstand a motion to dismiss is " 'a short and plain statement of the claim' that will give the [plaintiff] fair notice of what [defendant]'s claim is and the grounds upon which it rests." *Gould, Inc.,* 935 F.2d at 1276 (citing *Conley,* 355 U.S. at 47, 78 S.Ct. 99).

### 1. Statute of limitations

Plaintiff contends defendant's special plea in fraud claim should be dismissed because the six-year statute of limitations for filing

---

20. Plaintiff's statute of limitations argument is a basis for asserting lack of subject-matter jurisdic-

tion. *Burton v. United States,* 22 Cl.Ct. 706, 709 (1991).

such a counterclaim has expired. Plaintiff asserts that defendant knew of the defalcation since 1991, but did not file its counterclaim until ten years later in June 2001. Plaintiff believes the applicable statute of limitations is set forth in 28 U.S.C. § 2501 (1994). Defendant argues that its special plea in fraud claim is not subject to any statute of limitations, especially the one established in 28 U.S.C. § 2501. Defendant maintains that 28 U.S.C. § 2415 can be interpreted as stating that there is no statute of limitations for a special plea in fraud counterclaim.

Section 2501 provides, in pertinent part:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501. The Court of Federal Claims has issued inconsistent decisions on whether a special plea in fraud counterclaim is subject to this statute of limitations. In *SGW, Inc. v. United States*, 20 Cl.Ct. 174, 181 (1990) and *TS Infosystems, Inc. v. United States*, 36 Fed.Cl. 570, 574 (1996) this court concluded that 28 U.S.C. § 2501 does apply to a special plea in fraud claim asserted by the government, and therefore, the statute of limitations is six years. This court came to the opposite conclusion, however, in various other cases where it found that a special plea in fraud claim is not subject to *any* statute of limitations. *Jana, Inc. v. United States*, 34 Fed.Cl. 447, 452 (1995); *Erie Basin Metal Prods., Inc. v. United States*, 138 Ct.Cl. 67, 75, 150 F.Supp. 561 (1957); *Goggin v. United States*, 138 Ct.Cl. 279, 284, 152 F.Supp. 78 (1957). The Federal Circuit has not decided this issue.

This conflict in the caselaw is not problematic because the court believes that under either view defendant's claim is not barred by a limitations period. Of course, if the court agrees with *Jana* and its predecessors, no statute of limitations would apply because this court concluded that a special plea in fraud claim is not subject to a filing period. If the court follows *SGW* and *TS Infosys-*

*tems*, the statute of limitations would presumably have expired in 1997, *if* no other factors were involved.[21] Defendant did not file until June 6, 2001.

This conclusion would ignore, however, the unique circumstances this court established to administer the approximately 120 *Winstar*-related cases. For example, this specific case was stayed from April 27, 1993 until 1996, when the Supreme Court rendered its opinion in *Winstar*. Following this decision, then Chief Judge Smith issued the CMO to create special case management procedures for the *Winstar*-related cases. The CMO stated, in part:

This Order applies to all *Winstar*-related cases ("*Winstar* cases" or "cases"), including any claims, *special pleas in fraud,* defenses, affirmative defenses, setoffs, *counterclaims,* or any other issues raised in those cases . . . .

. . . .

This Order is intended to supplement, and not to replace, any Rule of the United States Court of Federal Claims, *except as inconsistent with this Order.*

. . . .

Following the exchange of core documents, any plaintiff may file a motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, regarding two liability-related issues only . . . . The defendant need not identify any defenses of any kind, counterclaims, setoffs, pleas in fraud, etc. ("defenses") in responding to the motions, and the failure to assert those defenses in its response will not constitute a waiver.

. . . .

*The defendant shall not file an answer to the complaint in any case, and no defenses or arguments of any kind shall be deemed waived by reason of the defendant's not having filed an answer to any complaint.* In addition, no allegation shall be deemed admitted, nor shall defendant be estopped from denying any allegation,

---

21. Defendant learned of the defalcation in 1991. Under plaintiff's theory for the six-year statute of limitations, defendant needed to file its counterclaim by 1997.

by reason of not having filed an answer to any complaint.[22]

The court interprets the CMO to specifically grant defendant the opportunity to withhold filing its answer and counterclaims until after the short-form motions for partial summary judgment are decided. Indeed, defendant sought permission from the court to be released from this requirement so that it could file its answer and counterclaim. The court granted defendant this relief in an order dated June 7, 2001.[23]

 The doctrine of equitable tolling allows the court to abate the effect of a statute of limitations when the proper circumstances require such an action. *TS Infosystems*, 36 Fed.Cl. at 573 (citing *Bailey v. Glover*, 21 Wall. 342, 88 U.S. 342, 347–48, 22 L.Ed. 636 (1874)); *see also Tyger Constr. Co. v. United States*, 28 Fed.Cl. 35, 51 (1993). The court believes the unique circumstances of the *Winstar* litigation, and the special case management procedures identified in the CMO, permit the court to equitably toll any statute of limitations that may apply to defendant's special plea in fraud counterclaim. The court relies on two previous *Winstar*-related cases when formulating this conclusion. Both *Anderson* and *Landmark Land Co., Inc. v. United States*, 46 Fed.Cl. 261 (2000) (*Landmark II*) contained special plea in fraud counterclaims.[24] These two cases do not specifically address the connection between the CMO and a possible tolling of the statute of limitations, nevertheless, they do provide circumstantial support for the court's conclusion.

In *Landmark*, the alleged fraud was perpetrated between 1986 and 1991. 46 Fed. Cl. at 274–75. The plaintiff filed its case in 1995. The defendant did not file its counterclaim until 1999. This court had to grant the defendant leave to file said counterclaim, presumably in response to the requirements of the CMO. *Landmark Land Co., Inc. v. United States*, 44 Fed.Cl. 16, 18 (1999) (*Landmark I*). In *Anderson*, the alleged fraud occurred in 1989. 47 Fed.Cl. at 447. The plaintiffs filed their complaint in 1991. This court granted the defendant leave to file its answer and special plea in fraud counterclaim on April 22, 1998. Both of these cases addressed fraud that occurred in the late 1980's, a complaint filed in the early 1990's, and a counterclaim filed by this court's leave at the end of the 1990's.

The plaintiffs evidently did not assert a statute of limitations defense in *Landmark* and *Anderson*. The court believes, however, that the relationship between the time of the fraud and the filing of the complaints and counterclaims, as well as the fact that the defendant asked for leave to file its answers and counterclaims, is significant. Indeed, it seems to indicate that the CMO made filing the counterclaims unnecessary until after the short-form motions were decided, thus tolling any statute of limitations that may have applied.[25]

Moreover, the court believes that applying a six-year statute of limitations to the government's special plea in fraud claim would greatly restrict this important defense designed to protect the government from fraudulent claims. Such a limitation would allow plaintiffs to wait until the six-year time period expired before filing their fraudulent

---

22. Order dated September 18, 1996 (emphasis added).

23. In fact, plaintiff opposed discovery on the defalcation for awhile, apparently to hinder defendant's ability to file a counterclaim. Tr. at 132.

24. *Glendale* also addressed a special plea in fraud claim, but the court deems this opinion inapplicable to its statute of limitations analysis because the CMO specifically stated that it did not apply to *Glendale*. *See* Order dated September 18, 1996 ("this Order does not apply to *Glendale Federal Bank, FSB v. United States*, No. 90–772C").

25. The plaintiffs in *Landmark* and *Anderson* did not challenge the counterclaims based on the statute of limitations, nevertheless, the court presumably would have *sua sponte* addressed this jurisdictional issue if it was indeed relevant. *See* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added)); *Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed.Cir.1988) ("A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt."); *Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed.Cl. 122, 132 (1996).

claims. The government would then be precluded from asserting a valid special plea in fraud defense. Indeed, the government can not assert this counterclaim before there is a claim against it. *See* 28 U.S.C. § 2514 ("A claim against the United States shall be forfeited ... by any person who corruptly practices ... fraud against the United States ...."). The court believes that 28 U.S.C. § 2514 was not designed to be limited by a statute of limitations, which plaintiffs could strategically manipulate. *See O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 210, 591 F.2d 666 (1979) (concluding that the special plea in fraud statute intended for every suit brought in the Court of [Federal] Claims to be subject to the forfeiture provided, on commission of the specified fraud). The court concludes, therefore, that defendant's counterclaim in the present case is timely.

In addition, plaintiff's briefs do not make clear whether it believes defendant's rescission claim should also be restricted by a six-year statute of limitations. The court asked plaintiff's counsel this question at oral argument, and he indicated that the rescission claim is subject to the six-year period.[26] For the reasons just discussed referencing the CMO and the special circumstances surrounding the *Winstar*-related cases, the court concludes that defendant's rescission claim is not time barred. The court further discusses the timeliness of defendant's rescission claim below.

### 2. Failure to state a claim

Plaintiff also argues that Counts I and II of defendant's counterclaim fail to state a claim upon which relief may be granted. Defendant disagrees and has filed a cross-motion for summary judgment as to its counterclaims and affirmative defenses. Plaintiff relies on numerous documents when discussing its failure to state a claim argument and when challenging defendant's cross-motion.

RCFC 12(b) provides that a motion to dismiss for failure to state a claim may be treated as a motion for summary judgment under RCFC 56 if "matters outside the pleading are presented to and not excluded by the court." RCFC 12(b); *Rockefeller Center Properties v. United States,* 32 Fed. Cl. 586, 589 n. 6 (1995). Plaintiff has submitted a detailed appendix with its reply brief to supplement the already voluminous appendix filed by defendant. Plaintiff relies upon these appendices many times when presenting its arguments for failure to state a claim. For example, plaintiff directs the court to various questionnaires and letters when challenging defendant's claim that plaintiff made numerous misrepresentations to the government.[27] Plaintiff also cites documents to prove that it recovered all of its losses from the defalcation.[28] In addition, plaintiff emphasizes examination reports prepared by the OTS.[29] All of these citations are set forth in the section of plaintiff's brief discussing its motion to dismiss for failure to state a claim. Since plaintiff clearly relies on more than just the pleadings, and for efficiency reasons, the court chooses to treat plaintiff's motion to dismiss for failure to state a claim as a motion for summary judgment. The court will consider plaintiff's arguments below in conjunction with defendant's cross-motion for summary judgment.

### 3. Defendant's affirmative defenses

Defendant lists numerous affirmative defenses in its answer to plaintiff's complaint: (1) fraud in the performance of the contract; (2) common law fraud; (3) forfeiture; (4) failure to satisfy material conditions precedent; (5) estoppel; (6) unjust enrichment; (7) illegality and violation of public policy; (8) prior material breach; (9) failure to mitigate damages; (10) failure of consideration; (11) unclean hands; (12) laches; and (13) assumption of risk. Plaintiff moves to strike all of these defenses because they are wholly conclusory and insufficiently plead.

---

26. Tr. at 101.

27. Plaintiff's Reply Brief In Support Of Its Motion To Dismiss Counts I And II Of Government's Counterclaim And Affirmative Defenses And Response To Government's Cross–Motion For Summary Judgment (Pl.'s Reply on Countercl.) at 13–

14 (citing App. at 179, 188–189, 196–197, 209–210, 215–216, 296).

28. *Id.* at 19 (citing App. at 249, 442–447).

29. *Id.* at 20 (citing App. at 528–530, 596–597, 639, 641).

The United States Court of Federal Claims requires only notice pleadings pursuant to RCFC 8. This rule is identical to its counterpart under the federal rules, which is equally applicable to the pleading of affirmative defenses. Fed.R.Civ.P. 8; *Conley,* 355 U.S. at 47, 78 S.Ct. 99; *Int'l Fidelity Ins. Co. v. United States,* 27 Fed.Cl. 107, 110 (1992); *Harris v. Sec'y, U.S. Dept. of Veterans Affairs,* 126 F.3d 339, 343 (D.C.Cir.1997). Defenses may be plead in general terms and provide merely fair notice of the nature of the defense. RCFC 8, Fed.R.Civ.P. 8; *see also Al–Kurdi v. United States,* 25 Cl.Ct. 599, 604 (1992). The "fair notice" pleading requirement is met if defendant sufficiently articulates the defense so that plaintiff is not a victim of unfair surprise. *Int'l Fidelity,* 27 Fed.Cl. at 110.

Even under the liberal notice pleading of the federal rules, however, "an allegation must include either direct or inferential allegations respecting all material elements of the claim asserted." *MAN Roland, Inc. v. Quantum Color Corp.,* 57 F.Supp.2d 576, 579 (N.D.Ill.1999) (citing *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991)). Thus, "[i]f an affirmative defense is insufficient on its face or comprises no more than 'bare bones conclusory allegations,' it must be stricken." *Codest Eng'g v. Hyatt Int'l Corp.,* 954 F.Supp. 1224, 1228 (N.D.Ill.1996).

After carefully reviewing defendant's affirmative defenses, the court concludes that they satisfy the liberal pleading requirements established by RCFC 8. Plaintiff's request to strike said defenses is therefore denied.

### B. *Summary judgment*

Defendant moves for summary judgment on its special plea in fraud and rescission counterclaims, as well as on some of its affirmative defenses. The court is treating plaintiff's motion to dismiss defendant's counterclaims for failure to state a claim as a motion for summary judgment.

### 1. Special plea in fraud

■ Defendant's special plea in fraud counterclaim is premised on 28 U.S.C. § 2514, which states:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

In general, the government asserts this counterclaim to challenge the presentment of a fraudulent claim, however, a special plea in fraud is not confined to this scenario. *Anderson,* 47 Fed.Cl. at 444. Defendant may also assert its special plea in fraud if the alleged fraud was practiced during the performance of the contract at issue. *Id.; UMC Electronics Co. v. United States,* 43 Fed.Cl. 776, 790 (1999); *Supermex v. United States,* 35 Fed.Cl. 29, 39–40 (1996). Defendant must prove its fraud claim by clear and convincing evidence. *Glendale Fed'l Bank, FSB v. United States,* 239 F.3d 1374, 1379 (Fed.Cir. 2001) (quoting *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed. Cir.1998)).

The parties dispute the elements that defendant must establish when asserting its special plea in fraud counterclaim. Defendant believes it only needs to show that plaintiff made fraudulent statements or omissions, and that it intended to deceive the government. Plaintiff maintains that defendant must prove justifiable reliance and actual damages in addition to showing fraudulent statements and an intent to deceive. Plaintiff therefore believes defendant must establish the four elements of common law fraud, which are: (1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Landmark II,* 46 Fed.Cl. at 274 (quoting *BMY–Combat Sys. v. United States,* 38 Fed.Cl. 109, 128 (1997) (citations omitted)).

It is understandable that the parties dispute the elements of a special plea in fraud counterclaim because the Court of Federal

Claims has not settled on an established rule. Sometimes this court has held that defendant only must prove plaintiff's knowledge of fraudulent statements and an intent to deceive. *Crane Helicopter Services, Inc. v. United States,* 45 Fed.Cl. 410, 432 (1999); *Glendale,* 43 Fed.Cl. at 400; *Supermex,* 35 Fed.Cl. at 42. In other cases this court has required defendant to prove all four elements of common law fraud. *Landmark II,* 46 Fed.Cl. at 274; *BMY–Combat Sys.,* 38 Fed. Cl. at 128; *Communication Equip. & Contracting Co., Inc. v. United States,* No. 72–88C, 1991 WL 288912, at *6 (Cl.Ct. Aug. 23, 1991). In at least one case, this court has not discerned any clear elements for proving a special plea in fraud claim. *Anderson,* 47 Fed.Cl. at 438.

Considering the type of fraud at issue-either in the presentment of a claim or during the performance of a contract-does not clear up this discrepancy. The decisions of this court have not consistently found that fraud in the presentment of a claim requires only two elements, for example, and fraud during the performance of a contract requires four. The Federal Circuit has stated on two different occasions, however, that when alleging fraud in the presentment of a claim, defendant only needs to prove an intent to deceive and plaintiff's knowledge that the submitted claims were false. *Glendale,* 239 F.3d at 1379; *Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042 (Fed.Cir. 1994). The Federal Circuit has not commented on whether the same is required to prove fraud that occurred during the performance of a contract.

Defendant relies heavily on *Supermex* to establish that it only must prove plaintiff's intent to deceive and knowledge of a fraudulent statement, however, this case makes clear the discrepancy just described:

> While it is apparent that the elements of knowledge and intent to deceive are prerequisites to a Special Plea in Fraud, it is not clear that the elements of justifiable reliance and actual damages are also prerequisites to establishing a Special Plea in Fraud pursuant to 28 U.S.C. § 2514. This court believes that *in the instant case,* 28 U.S.C. § 2514 can be invoked without the need to prove either justifiable reliance by the sovereign or specific evidences of injury to the sovereign.

35 Fed.Cl. at 42 (emphasis added).

After careful consideration of the parties' arguments and the uncertainty in the existing case law, the court concludes that the circumstances of the existing case require defendant to prove all four elements of common law fraud to assert its special plea in fraud claim. The court reaches this conclusion because defendant is alleging fraud that occurred during the performance of the contract, not in the presentation of a claim. As the Federal Circuit seems to have concluded, when the alleged fraud is related to the presentment of a claim, all defendant needs to prove is that plaintiff knew the submitted claim was false and that plaintiff intended to defraud the government by submitting the claim. *Glendale,* 239 F.3d at 1379. This makes sense because it is the claim itself that is allegedly fraudulent, so it is important to discern plaintiff's state of mind for making such a claim. There is no need to establish the government's reliance in this instance because it is the claim itself that is being examined. This is unlike the situation where the fraud occurs during the performance of a contract, and defendant relies on this fraud as assurance that plaintiff is properly adhering to the contract. The harm the government incurs from the presentment of a fraudulent claim is plaintiff's breach of the public trust. *Supermex,* 35 Fed.Cl. at 42.

In contrast, fraud that is committed during the performance of the contract is not necessarily as obvious or well-defined. Finding said fraud depends more on the court's interpretation of the relevant circumstances. Under this scenario, it seems necessary to have defendant prove its reliance on the alleged fraud and an injury related to it. Otherwise defendant could avoid numerous contractual claims by citing potentially fraudulent events occurring during performance that are completely unrelated to the contract, even though in reality said fraud was never directed towards defendant and defendant in no way suffered from it. The court believes this loose interpretation of the special plea in fraud statute might deter private parties

from filing valid claims, thus tarnishing the integrity of the procurement process. The court is not willing to adopt such an interpretation.

Defendant must therefore prove the four elements of common law fraud to establish its clam that plaintiff committed fraud during the performance of the contract. Again, these elements are: (1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Landmark II*, 46 Fed.Cl. at 274 (quoting *BMY–Combat Sys.*, 38 Fed. Cl. at 128 (citations omitted)). In its attempt to establish its counterclaim, defendant maintains that Mr. Orchowski's defalcation deceived federal regulators and breached the terms of the Assistance Agreement. Defendant believes Mr. Orchowski's fraudulent actions should be imputed to plaintiff. In addition, defendant argues that plaintiff's failure to discover Mr. Orchowski's defalcation proves that it did not operate Lansing in a safe and sound manner.

Plaintiff contends the court should not impute Mr. Orchowski's activities to it because his actions were adverse to its interests. Plaintiff also asserts that defendant cannot prove its special plea in fraud claim because it cannot show how the government was harmed by Mr. Orchowski's actions. Furthermore, plaintiff emphasizes that it recovered all of the money it lost from Mr. Orchowski's actions, and that it was back in compliance with the regulatory capital requirements within a year after discovering the defalcation.

### a. Imputation

Before addressing the specific elements of defendant's special plea in fraud claim, the court must examine the underlying issue related to all four elements-whether Mr. Orchowski's actions can be imputed to plaintiff. Defendant argues that they should, while plaintiff maintains it is not responsible for his actions because they were adverse to plaintiff's interests. Defendant relies heavily on this court's decisions in *Anderson*, 47 Fed.Cl. 438, and *Wagner Iron Works v. United*

*States*, 146 Ct.Cl. 334, 174 F.Supp. 956 (1959) to support its assertions.

■■■ In general, a corporation can only act through its agents, "and when they are clothed with the authority to act for it, the corporation is responsible for their acts." *Id.*, 146 Ct.Cl. at 337–38, 174 F.Supp. 956 (citing *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *Standard Surety & Cas. Co. of New York v. Plantsville Nat'l Bank*, 158 F.2d 422 (2d Cir.1946); *Ralston Purina Co. v. Novak*, 111 F.2d 631 (8th Cir.1940)). This does not mean, however, that every action an employee takes is automatically imputed to the corporation. If the employee is acting outside of his or her actual or apparent authority, for example, the corporation is generally not liable for said actions. *Id.* In addition, many courts follow the rule that if the employee's actions are adverse to the corporation's interests, and the corporation does not benefit from said actions, the corporation is not liable for them. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 359 (3d Cir.2001); *In re Payroll Express Corp.*, 186 F.3d 196, 207 (2d Cir.1999); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771–72 (4th Cir.1995). Indeed, the Restatement (Second) of Agency § 282 (1957) provides:

(1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in Subsection (2).

(2) The principal is affected by the knowledge of an agent who acts adversely to the principal:

(a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;

(b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or

(c) if, before he has changed his position, the principal knowingly retains a ben-

efit through the act of the agent which otherwise he would not have received.

■ The above-stated principles have led courts to conclude that the general rule of imputation is that the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was "(1) in the course of his employment and (2) for the benefit of the corporation." *Official Comm. Unsecured Creditors,* 267 F.3d at 358. *See also Vitale v. Aetna Cas. & Sur. Co.,* 814 F.2d 1242, 1247 (8th Cir.1987); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir.1975); *Standard Oil Co. of Tex. v. United States,* 307 F.2d 120, 127 (5th Cir. 1962); *In re Cendant Corp. Securities Litigation,* 109 F.Supp.2d 225, 233 (D.N.J.2000). The court believes this is a good summary of the law for imputation and will therefore follow this test.[30]

Defendant alleges in its briefs two types of fraudulent conduct that Mr. Orchowski performed that it believes the court should impute to plaintiff. This conduct is: (1) the defalcation itself and (2) alleged misrepresentations Mr. Orchowski made to the government to conceal his illegal activities.

### 1.) Defalcation

■ With respect to the defalcation, Mr. Orchowski plead guilty for his conduct related to this fraudulent act. Specifically, he turned himself in to the FBI in September 1991, admitting that he had defrauded plaintiff over a period of nine years. The total amount he embezzled from plaintiff was approximately $100,000. He also misappropriated other funds, primarily through his activities involving the making of unauthorized loans. In addition, he altered existing loans and paid extortion to borrowers who threatened to reveal his unlawful activities. Plaintiff's total losses from his actions neared $10 million. He was subsequently charged in a criminal information proceeding with a violation of 18 U.S.C. § 1344 for one count of bank fraud. He plead guilty in 1992 to willfully misapplying funds belonging to, and under the custody and control of, plaintiff. He entered a plea agreement where he admitted the following: (1) making no less than sixty unauthorized loans with funds belonging to plaintiff; (2) many of these loans were extended to individuals who plaintiff previously had denied based on their credit risk, loan purpose, or plaintiff's loan policies; (3) failing to obtain properly executed loan documentation for many of the unauthorized loans; and (4) failing to perfect plaintiff's security interest in collateral for the loans. He was sentenced to thirty-one months in prison and ordered to pay restitution to plaintiff. Plaintiff recovered all losses it incurred as a result of the defalcation.

Arguably, some of these actions were performed in the course of business because Mr. Orchowski made loans, albeit unauthorized ones, which plaintiff is in the business of doing. Nevertheless, clearly none of the activities Mr. Orchowski plead guilty to benefitted plaintiff, which is the second aspect of the imputation test the court has adopted. The court does not believe that embezzlement, misappropriated funds through unauthorized loans, and extortion benefitted plaintiff in any way.[31] Defendant's argument that the defalcation should be imputed to plaintiff, therefore, is unpersuasive.[32]

---

**30.** The court notes the parties' debate on whether Illinois law on imputation should apply. The court discusses this argument in more detail below while addressing the adverse interest exception. Specifically, the court chooses to follow the law of imputation as generally explained by the federal courts. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (concluding that if the rights and duties of the parties derive sufficiently from a federal source, then federal common law may be held to govern aspects of the case. This federal common law can be derived from state law, as long as there is uniformity between the states.). Illinois law, however, is in accordance with the court's analysis.

**31.** In addition, Mr. Orchowski was not the chief executive officer (CEO) of plaintiff, unlike the perpetrator in *Anderson,* who was the controlling shareholder and CEO. 47 Fed.Cl. at 447. This is one example of how *Anderson* is distinguishable from this case.

**32.** The court notes defendant's argument that Mr. Orchowski's conviction proves that plaintiff committed fraud against the government and collaterally estops plaintiff from challenging defendant's fraud claim. This argument fails because Mr. Orchowski never plead guilty to, and never was convicted of, defrauding *the government.* All of his actions were found to have been committed against plaintiff.

This conclusion is premised on the court's belief that plaintiff should not be held liable for Mr. Orchowski's actions when said actions were adverse to plaintiff's interests. In response to this theory, which plaintiff espoused in its briefs and at oral argument, defendant contends this court made clear in *Anderson* that this jurisdiction does not recognize the adverse interest exception.[33] Defendant relies on a sentence in the *Anderson* decision that states "this circuit has not traditionally recognized the exception." 47 Fed. Cl. at 448. Defendant is interpreting this phrase to mean much more than it actually does.

Indeed, a previous decision in this court is not binding precedent on a latter case. *Tech. For Communications Int'l v. United States,* 22 Cl.Ct. 711, 713 (1991). The fact that this court did not choose to apply the adverse interest exception in *Anderson,* therefore, does not prohibit the court from deciding otherwise in the present case. The Federal Circuit, whose decisions bind this court, has never expressly stated that it refuses to adopt the adverse interest exception. Instead, it seems that based on the facts of each particular case, this court has not utilized said exception. For example in *Wagner,* which defendant cites heavily throughout its briefs, this court stated that "[i]f Wagner alone had been guilty of fraud, there might be some merit in plaintiff's argument." 146 Ct.Cl. at 338, 174 F.Supp. 956. This court was referring to the president and majority stockholder of the plaintiff corporation, Mr. A.A. Wagner, and the fact that his fraudulent actions alone may not have been enough to grant the defendant's special plea in fraud claim, because his acts were committed against the company. *Id.* The same is true in *Anderson* where this court stated that the main reason it was not adopting the adverse interest exception was because "although some of the criminal acts were done

to benefit Mr. Paul personally, other fraudulent acts, including lying to federal banking regulators, were done ostensibly to advance the criminal schemes being carried out *to benefit the bank.*" 47 Fed.Cl. at 448 (emphasis added). The court believes that in the present case, Mr. Orchowski was the lone fraudulent actor and his conduct in no way benefitted the bank. The court chooses to adopt the adverse interest exception, therefore, and concludes that Mr. Orchowski's defalcation cannot be imputed to plaintiff.[34]

### 2.) Misrepresentations

Moreover, defendant alleges that Mr. Orchowski made knowing misrepresentations to the government to conceal his illegal activities, including: (1) providing false information to regulators when preparing plaintiff's responses to management questionnaires that were part of its annual regulatory examination; (2) submitting false reasons as to why the so-called Harris Bank NOW account could not be reconciled according to an annual audit; (3) providing material misrepresentations to OTS concerning the status of a loan for one of plaintiff's customers; and (4) possibly inflating and distorting plaintiff's balance sheet with respect to goodwill. Defendant also argues that Mr. Orchowski was the "point man" for negotiations to acquire Lansing, and that he purposefully concealed his fraud so he could persuade defendant that plaintiff was a safe and sound institution. Defendant believes all of these actions are imputable to plaintiff.

With respect to the management questionnaires plaintiff submitted to FHLBB, Mr. Orchowski was not the person who actually prepared them. Indeed, Mr. Ginalski was responsible for their completion. Defendant alleges that Mr. Orchowski "initialed" them so they are fraudulent, since he did not mention his defalcation. The court does not agree with this argument.

---

**33.** Tr. at 136.

**34.** As mentioned above, plaintiff argues that Illinois' law for imputation, which expressly follows the adverse interest exception, applies to this case. Defendant asserts that Illinois law is inapposite. The court does not need to decide this issue because it believes the adverse interest exception applies to the circumstances of this case—

pursuant to the previous holdings of this court and other federal jurisdictions. The court would come to the same conclusion if Illinois law applied. It is therefore unnecessary to examine this choice of law issue because the same result would be reached by this court under Illinois law and the previous holdings of the federal courts.

Since the questionnaires were not actually filled out by Mr. Orchowski, the court would have to conclude that the actual preparer, Mr. Ginalski, intended to hide the defalcation in order for them to serve as misrepresentations to the government. A review of the documents reveals that this did not occur. One of the questionnaires requested the identity of "any director, officer, employee, attorney, or agent, who has since the last examination, embezzled, abstracted, misapplied or otherwise misused, any funds or other assets for which the institution was accountable." [35] Plaintiff answered "None" to this question when it was submitted in 1984. Defendant argues this was deceptive because Mr. Orchowski was committing fraud at that time, however, defendant is misinterpreting this query. The question plainly seeks to identify improprieties that plaintiff had discovered. Plaintiff did not learn of Mr. Orchowski's fraud until 1991. Defendant has conceded this fact.[36]

Defendant also refers to plaintiff's responses to two other questionnaires requesting plaintiff to describe: (1) "details of each oral or written agreement not recorded on the institution's permanent records which affects the financial condition of the institution"; and (2) "any current or former director, officer, employee, attorney, or agent of the institution who has (or has been suspected of having) misused, embezzled, abstracted, or wilfully misapplied any funds or property, real or personal, of the institution or subsidiaries." [37] Defendant emphasizes that the answers to these questions were "N/A." Again, defendant seems to misinterpret the meaning of these questions. Clearly they ask for information known to plaintiff at that time, and they do not serve as a warranty that no such circumstances existed.

As for plaintiff's letter to the Federal Home Loan Bank of Chicago regarding the reconciliation of the Harris NOW Account, defendant alleges it contains misrepresenta-

tions of why the account could not be reconciled. The letter states, in part:

The bank account in question was the Harris Bank NOW Clearing Account. It was found that this account was being charged for cash letter items which did not belong to First Federal Savings of Hegewisch.

First Federal Savings of Hegewisch personnel with the help of Accounts people at Harris Bank, have identified this problem and have taken the necessary steps to prevent such occurrences from happening in the future.

WE, the Board of Directors of First Federal Savings of Hegewisch, hope that we have addressed fully the comment that has been brought forth in the Management letter from Deloitte, Haskins, and Sells and assure you that the necessary steps have been taken to correct the problem. Comments or recommendations by the Federal Home Loan Bank of Chicago would be welcomed.[38]

The court does not believe this statement was misleading at the time it was made, based on the fact that plaintiff was not aware of the defalcation at that time. Therefore, the letter did not serve as a misrepresentation to defendant.

In regards to the letter Mr. Orchowski purportedly sent to OTS regarding a loan transaction, the copy of the letter before the court is a mere draft and is unsigned.[39] There is nothing in the documents presented to the court that indicates this letter was actually sent to OTS. In addition, the letter does not appear to contain any misrepresentations concealing Mr. Orchowski's fraudulent activities. This document also does not serve as proof that misrepresentations were made.

Defendant also relies on a statement by plaintiff's vice president that Mr. Orchowski may have inflated the Lansing goodwill fig-

35. Def.'s Cross–Mot. on Countercl., App. at 179.

36. Defendant's Proposed Findings Of Uncontroverted Facts In Support Of Its Cross–Motion For Summary Judgment As To Counterclaims And Affirmative Defenses (Def.'s Facts) at 18, ¶ 91.

37. Def.'s Cross–Mot. on Countercl., App. at 209–210.

38. *Id.* at 188–89.

39. *Id.* at 215–16.

ure through his unauthorized activities. This statement in no way proves that the figure was indeed inflated. Moreover, it does not reflect an actual misrepresentation made to the government. Defendant's citation to this statement is unpersuasive because it is founded wholly on speculation.

Finally, defendant asserts that Mr. Orchowski was the "point man" for negotiations with the government during the Lansing acquisition. Defendant maintains that he concealed his defalcation at the time, and lead defendant into believing that plaintiff operated in a safe and sound manner. Defendant believes he was acting on behalf of plaintiff and that this misrepresentation should be imputed to plaintiff.

Defendant has provided some evidence that Mr. Orchowski was a contact person for plaintiff during the Lansing acquisition,[40] however, defendant has not established Mr. Orchowski's actual involvement in the negotiations. It is apparent that the negotiations were mainly handled by Mr. Ginalski, plaintiff's chairman of the board at the time. Defendant also has not stated what exact misrepresentations Mr. Orchowski made to defendant about the safety and soundness of plaintiff.[41] Thus, just as the court concluded with the various misrepresentations discussed above, it is unnecessary to determine whether Mr. Orchowski's actions should be imputed for these instances because defendant cannot show that these misrepresentations were actually made.[42]

Accordingly, the court concludes that Mr. Orchowski's fraudulent actions cannot be imputed to plaintiff because his fraud was committed against plaintiff, not the government. In no way did plaintiff benefit from said fraud. In addition, defendant has not established that Mr. Orchowski misrepresented information to the government.[43]

### b. Scope of the contract

█ Another central issue the court needs to address before examining the specific elements of fraud is whether the contract between the parties required plaintiff to operate Lansing in a safe and sound manner. In their briefs and at oral argument, the parties disputed whether the contract between them explicitly required plaintiff to manage Lansing in this way. Defendant cited various provisions of the Assistance Agreement to support its claim that plaintiff was contractually bound to do so.[44]

The court has concluded that the scope of the contract was to allow plaintiff to use the purchase method of accounting to record supervisory goodwill and to include said goodwill for regulatory capital compliance purposes. After careful review of the Assistance Agreement and the other documents in which the contract is comprised, the court does not believe that the contract *expressly* required plaintiff to operate Lansing in a safe and sound manner. Nevertheless, the court believes it was inherent in the agreement between the parties that plaintiff manage Lansing in this way. Indeed, plaintiff agrees that it should operate safely and

**40.** *Id.* at 437–40.

**41.** As discussed below, the court believes plaintiff was operated in a safe and sound manner. The low ratings that resulted from the discovery of the defalcation only lasted for a short period of time. Also, plaintiff is still an existing, viable thrift.

**42.** One final issue defendant raises in connection to imputation is that Mr. Orchowski's actions were within his apparent authority, and thus, plaintiff is bound by them. This argument fails because the court has concluded that the defalcation was not in the best interest of plaintiff and did not benefit plaintiff. Also, plaintiff did not authorize Mr. Orchowski to embezzle money or make illegal loans. In addition, defendant cannot successfully prove that Mr. Orchowski made any misrepresentations to defendant.

**43.** Defendant suggested at oral argument that plaintiff knew about the defalcation earlier than 1991, but concealed this knowledge and did nothing to remedy the situation. Tr. at 143. Defendant relies on a report by the FDIC that incorporates a letter from plaintiff's counsel suggesting that familial relationships clouded the management's perspective on the issue. The court is not persuaded by defendant's argument because it is based on nothing more than a third party's speculative view of the circumstances. Also, defendant concedes in its findings of fact that plaintiff's management was unaware of the defalcation. Def.'s Facts at 18, ¶ 91.

**44.** Tr. at 156.

soundly.[45] Therefore, the court agrees with defendant that there was a safety and soundness requirement, which must be taken into account when examining the specific elements for fraud.[46]

### c. Analysis of elements of fraud

 The court's conclusion on imputation simplifies the analysis of the four elements of fraud defendant must establish to prove its claim. The first element is a misrepresentation of material fact. The court determined in the above analysis that Mr. Orchowski did not provide misrepresentations to the government. The court also decided that plaintiff was not liable for Mr. Orchowski's defalcation. Defendant, therefore, cannot prove by clear and convincing evidence that plaintiff made a misrepresentation of material fact related to Mr. Orchowski's actions.

In addition, defendant argues that, not only did Mr. Orchowski individually deceive the government during the negotiations for the Lansing acquisition,[47] but plaintiff also lead defendant into believing that it had strong management and was operated in a safe and sound manner. Defendant alleges it never would have approved plaintiff for the Lansing merger if it knew the defalcation was occurring. Defendant ignores the fact, however, that plaintiff was unaware of the defalcation at the time of the negotiations.[48] Also, Mr. Orchowski's actions are not imputable to plaintiff. In addition, the court believes that plaintiff did have strong management and was operated in a safe and sound manner, as evident in plaintiff's typically favorable OTS ratings and the fact that plaintiff is still an existing thrift, even after the enactment of FIRREA. Indeed, as discussed below, the negative OTS rating plaintiff received after the discovery of the defal-

cation quickly rebounded the following year to a favorable mark. Also, plaintiff was able to recover the money it lost from the defalcation. The court finds defendant's argument unconvincing.

The second element is an intent to deceive the government. Defendant fails to satisfy this requirement too because it has not shown that Mr. Orchowski misrepresented information to the government and that his actions are imputed to plaintiff. Defendant also has not established any separate intent by plaintiff to conceal Mr. Orchowski's actions. Defendant has conceded that plaintiff was unaware of the defalcation.[49]

The third element for a special plea in fraud claim is justifiable reliance on the misrepresentations by the deceived party. As just discussed, defendant has not established any misrepresentations, so this element fails for that reason alone. Defendant also claims that it relied on plaintiff to run the thrift in a safe and sound manner and that plaintiff failed to do so. Again, this argument has already been rejected by the court.

The final element defendant must prove is an injury it received based on the reliance. Defendant is unable to establish any harm because it was plaintiff and its customers who were subjected to Mr. Orchowski's fraud, not defendant. Also, the contract between the parties is to ensure the continuing success of Lansing, which was a failing thrift. Plaintiff merged with Lansing to guarantee its survival. Even during Mr. Orchowski's defalcation plaintiff was a viable thrift, and it remains so today. In addition, after plaintiff learned of the defalcation, it was able to

---

45. *Id.* at 178.

46. The court notes plaintiff's assertion at oral argument that the Assistance Agreement expired in 1985, and therefore, any safety and soundness requirement encompassed in it also terminated at that time. *Id.* at 177. The court does not agree with this argument because it believes that inherent in the contract was the requirement for plaintiff to manage Lansing in a safe and sound manner. The court has concluded that the contract was based on more than just the Assistance Agreement. Thus, notwithstanding the Assistance Agreement's expiration in 1985, the con-

tract requirements continued to govern the parties' relationship.

47. An argument the court has already rejected.

48. Indeed, plaintiff asserts that, at most, it was guilty of negligence because it did not discover the defalcation on its own. Plaintiff's Motion To Dismiss Counts I And II Of Government's Counterclaim And Affirmative Defenses at 3. Defendant has not asserted a negligence claim.

49. Def.'s Facts at 18, ¶ 91.

recover the full amount of its losses from Mr. Orchowski's activities.

Moreover, defendant admits that "the Lansing branches have consistently been Hegewisch's most profitable branches."[50] Also, contrary to defendant's assertions, it appears that plaintiff did not fall out of compliance with the regulatory capital requirements as a result of the defalcation.[51] The FDIC did give plaintiff the lowest safety rating after the defalcation was discovered, but prior to this, and within a year after it, plaintiff enjoyed very favorable examination reports and ratings. Indeed, the OTS Examination Report dated August 21, 1992, which is less than one year after the defalcation's discovery, commented that plaintiff's "overall financial condition has stabilized and is considered satisfactory."[52] It also stated that plaintiff's "board of directors ... and management have demonstrated effective supervision and administration of the institution's affairs since the defalcation."[53] Thus, the court concludes defendant was not harmed by the defalcation.[54]

Defendant has therefore failed to show by clear and convincing evidence that: (1) Mr. Orchowski made misrepresentations to the government; (2) plaintiff would be responsible for any such misrepresentations; (3) plaintiff intended to deceive the government; (4) defendant relied on Mr. Orchowski's fraudulent acts; and (5) defendant was harmed by the defalcation. Defendant is unable to establish its special plea in fraud claim.

### 2. Rescission

Defendant's second counterclaim is for rescission of the Assistance Agreement, an action that would return the $2 million FSLIC paid plaintiff from the special reserve ac-

count. Defendant believes the Assistance Agreement is void *ab initio* because plaintiff defrauded the government. Plaintiff argues that defendant's rescission claim is untimely because it was filed ten years after defendant learned of the defalcation. Plaintiff also maintains that a contract should not be rescinded if both parties cannot be returned to the *status quo ante*.

 "The remedy of rescission allows a party to seek disaffirmance of a contract and the return to the status quo that existed before the transaction was executed." *First Hartford Corp. Pension Plan & Trust v. United States*, 42 Fed.Cl. 599, 616 (1998) (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F.Supp. 1199, 1212 (S.D.N.Y.1994), *aff'd* 57 F.3d 146 (2d Cir.1995)). Rescission is "limited to situations where it is possible to return the parties to the *status quo ante*." *Dairyland Power Coop. v. United States*, 27 Fed. Cl. 805, 813 (Fed.Cl.1993).

With respect to plaintiff's timeliness issue, this fails for the same reasons discussed above for plaintiff's argument that defendant's special plea in fraud claim is time barred. The defalcation occurred in 1991. Plaintiff filed its complaint on March 22, 1993. On April 27, 1993, this court stayed the proceedings in this case pending the disposition of *Winstar*. The CMO entered on September 18, 1996, after the disposition of *Winstar*, clearly stated that defendant need not raise defenses or counterclaims until after plaintiff's short-form motion for partial summary judgment is decided. The court excepted defendant from this requirement in an order dated June 7, 2001. Thus, defendant's rescission counterclaim cannot be disregarded merely because it was filed in 2001.

---

50. Def.'s Cross–Mot. on Countercl. at 44.

51. *Id.*, App. at 249.

52. Pl.'s Reply on Countercl., App. at 596.

53. *Id.*

54. At oral argument, defendant's counsel argued that the harm it experienced was a breach of the public trust, a frustration of government policy objectives, and the loss of the $2 million plaintiff

debited from the special reserve account. Tr. at 125. The court has concluded that Mr. Orchowski's actions cannot be imputed to plaintiff, that plaintiff did not misrepresent information to defendant, and that plaintiff was operated in a safe and sound manner. Therefore, there was no breach of the public trust or frustration of government policy objectives. In addition, plaintiff properly debited the $2 million in assistance per the terms of the contract.

■ Defendant's rescission claim does fail, however, for other reasons. Defendant argues that the fraud perpetrated by plaintiff renders the Assistance Agreement void *ab initio*. Defendant contends the ordinary rules of rescission, such as returning the parties to the *status quo ante*, do not apply when there is fraud. It is true that generally, "a Government contract tainted by fraud or wrong-doing, is void *ab initio*," rather than merely voidable. *Godley v. United States*, 5 F.3d 1473, 1475 (Fed.Cir.1993) (citing *J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed.Cir.1988), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988)). Nevertheless, defendant has not established any fraud committed by plaintiff. Defendant's argument is therefore legally insufficient.

Moreover, even if defendant could establish fraud, the court believes it is impossible to return the parties to the *status quo ante* at this point. Plaintiff could feasibly repay defendant the $2 million debited from the special reserve account. It would be impossible and wholly irresponsible, however, to dissolve the merger between plaintiff and Lansing-an action rescission also mandates in this case. *See Dairyland Power*, 27 Fed.Cl. at 813 (rescission requires returning both parties to the *status quo ante*). Plaintiff has successfully operated Lansing since its acquisition. Such an action would not be in the best interest of the parties involved.

### 3. Arguments based on defendant's affirmative defenses

Defendant discusses three of its affirmative defenses in its cross-motion for summary judgment, all of which are premised on defendant successfully proving its special plea in fraud claim. As just discussed, the court concludes that defendant cannot establish this claim. This decision precludes defendant's assertion set forth in these three affirmative defenses. The court will, therefore, only briefly describe these defenses.

#### a. Federal common law fraud

Defendant argues that plaintiff's fraud (premised on the belief that Mr. Orchowski's actions can be imputed to plaintiff) frustrated strong public policy. Specifically, defendant maintains that when a contractor misrepresents its status or condition to procure a government contract or to cause the government to perform pursuant to a pre-existing contract, as plaintiff allegedly did here, and the misrepresentation frustrates the public policy objectives of the government, the contract is voidable or subject to voidness. Defendant's public policy argument lacks merit because, in the absence of actual fraud, the alleged violation of some vague public policy does not render a contract void. *J.E.T.S., Inc.*, 838 F.2d at 1199–1201. Without proving fraud, defendant cannot assert this public policy argument.

#### b. Common law conflict of interest principles

Defendant also asserts that OTS concluded during its special examination of plaintiff in 1991 that Mr. Orchowski's actions constituted a violation of the conflict of interest principles. Defendant maintains the OTS determined that his personal financial interests were in direct contravention to OTS's paramount interest in the prevention and elimination of practices and conditions that adversely affected the thrift's safety and soundness. Defendant believes its contract with plaintiff is unenforceable because Mr. Orchowski's conflict of interest is imputed to plaintiff. As discussed above, defendant's imputation argument is unpersuasive. Thus, its conflict of interest argument is also unconvincing.

#### c. Prior material breach

In addition, defendant argues that Mr. Orchowski's fraud began prior to defendant's enactment of FIRREA, and thus, plaintiff is precluded from asserting defendant's breach of contract because plaintiff was the first to breach. Again, this argument fails because Mr. Orchowski's actions cannot be imputed to plaintiff. Also, defendant is unable to establish the fraud upon which plaintiff's supposed material breach is founded.

### Conclusion

For the above-stated reasons, plaintiff's short-form motion for partial summary judgment on contractual liability is GRANTED because the parties had a contractual relationship that allowed plaintiff to use the pur-

chase method of accounting and to include supervisory goodwill for regulatory capital compliance purposes. The enactment of FIRREA breached this contract. Defendant's corresponding cross-motion for summary judgment on Count I of plaintiff's complaint is DENIED.

In addition, plaintiff's motion to dismiss defendant's counterclaims and affirmative defenses consists of three arguments: (1) lack of subject-matter jurisdiction because the statute of limitations has expired; (2) failure to state a claim upon which relief may be granted; and (3) a request to strike defendant's affirmative defenses because they are insufficiently plead and wholly conclusory. The part of plaintiff's motion that addresses subject-matter jurisdiction is DENIED because there is no statute of limitations that applies to defendant's counterclaims. With respect to plaintiff's failure to state a claim argument, the court has decided to treat this part of plaintiff's motion as a motion for summary judgment, because plaintiff relies on more than just the pleadings. This part of plaintiff's motion is GRANTED because defendant has failed to establish the elements of its special plea in fraud and rescission counterclaims. Plaintiff's request to strike defendant's affirmative defenses, however, is DENIED because defendant has sufficiently plead said defenses. Moreover, defendant's corresponding cross-motion for summary judgment on its counterclaims and affirmative defenses [55] is DENIED.

Furthermore, the parties shall submit a joint status report discussing further proceedings by Monday, August 5, 2002.

IT IS SO ORDERED.

55. Defendant has moved for summary judgment on three of its affirmative defenses: (1) federal common law fraud; (2) common law conflict of interest; and (3) prior material breach.