AMERICAN HERITAGE BANCORP,
Plaintiff,

and

Federal Deposit Insurance Corporation,
Plaintiff–Intervenor,

v.

The UNITED STATES, Defendant.

No. 90–3982C.

United States Court of Federal Claims.

March 4, 2003.

---

Daniel J. Goldberg, Washington, DC, for plaintiff.

Richard M. Schwartz, Washington, DC, for plaintiff-intervenor.

John H. Roberson, U.S. Department of Justice, Washington, DC, with whom were, Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

Currently pending before the court are two motions by plaintiff American Heritage Bancorp ("AHB"). The first is AHB's August 15, 2002 motion to strike or dismiss defendant United States's ("government's") defenses and counterclaims in this *Winstar*-related litigation. AHB contends that the government's defenses and counterclaims to its breach of contract claims should be dismissed for lack of jurisdiction under 12(b)(1) of the Rules of the United States Court of Federal Claims ("Rules" or "RCFC"). In the alternative, AHB asserts that the government's counterclaims should be dismissed for failure to state a claim upon which relief may be granted under RCFC 12(b)(6). The second motion before the court is AHB's October 28, 2002 motion to strike portions of the government's opposition to AHB's motion to dismiss counterclaims and affirmative defenses. The court resolves each of these motions below.

## I. *BACKGROUND LITIGATION FACTS*

### A. Litigation History

AHB filed this *Winstar*-related action on December 3, 1990, seeking damages in connection with the failure of Home Federal Savings Bank in Massachusetts ("Home"). In particular, AHB charges that passage the Financial Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1989), resulted in a breach of AHB's contract to acquire Home in June 1986.

On June 3, 1993, and again on September 3, 1993, before the government filed any answer or counterclaims, former Chief Judge Loren Smith stayed the proceedings in this case pending disposition of the interlocutory appeal before the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995). Following the Federal Circuit's August 30, 1995 ruling in *Winstar*, Judge Smith continued the stay of proceedings in all of the *Winstar*-related cases pending the final decision by the Unit-

ed States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

After the Supreme Court's July 1, 1996 decision in *Winstar*, Judge Smith, on September 18, 1996, entered the Omnibus Case Management Order ("CMO") concerning the case management of all *Winstar*-related cases before the court, including this case. The CMO was the product of extensive negotiations between the Plaintiffs' Coordinating Committee and counsel for the United States. Specifically, Section 5 of the CMO addressed "Initial Determinations Regarding Liability," and provided in relevant part:

Section 5.a.

Following the exchange of core documents [governed by § 4.a.], any plaintiff may file a motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, regarding two liability-related issues only: (1) whether a contract(s) existed in each case; and (2) whether the Government acted inconsistently with that contract(s) . . . .

Section 5.b.

The defendant will respond within 60 days with respect to those two issues, . . . . The defendant need not identify any defenses of any kind, counterclaims, setoffs, pleas in fraud, etc. ("defenses") in responding to the motions, and the failure to assert those defenses in its response will not constitute a waiver . . . .

Section 5.c.

The defendant shall not file an answer to the complaint in any case, and no defenses or arguments of any kind shall be deemed waived by reason of the defendant's not having filed an answer to any complaint. In addition, no allegation shall be deemed admitted, nor shall defendant be estopped from denying any allegation, by reason of not having filed an answer to any complaint . . . .

Section 5.d.

Within 120 days of the filing of a motion for partial summary judgment, . . . the defendant shall set forth, in accordance with the requirements of the rules of this Court, any defenses of which it knows or has reason to know that relate to the two issues asserted in the motion. . . .

On August 11, 1997, the court issued a revised CMO before AHB filed its motion for partial summary judgment in this case. Procedural Order No. 1: Master Litigation Plan, provided in paragraph VI.A.I that:

Within 30 days after commencement of Phase II case-specific discovery in a case, the defendant shall file a response to the Complaint in accordance with the rules of this Court, unless a dispositive motion (including a partially dispositive motion) is pending. In cases in which a dispositive motion is pending, the defendant shall file a response to the Complaint within 30 days after issuance of an Order resolving the motion, to the extent a response is necessary.

On February 14, 2002, the case was transferred to this court, and on July 1, 2002, the court ordered the government to file its answer and any counterclaims by July 8, 2002, in order to finally expedite resolution of the case. The government filed its answer and counterclaims on July 8, 2002. The government focused its defenses and counterclaims on the alleged fraud committed by officers and members of AHB's Board of Directors, in both the acquisition and management of Home. The counterclaims include a request for forfeiture of AHB's claims under the Special Plea in Fraud statute, 28 U.S.C. § 2514.[1] On August 15, 2002, AHB moved to dismiss the counterclaims and to strike the government's defenses. Briefing was completed in late 2002.

### B. Related Directors and Officers Litigation

In addition to the pending action, some of the same parties were involved in earlier

---

1. 28 U.S.C. § 2514 provides:
   A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
   In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

litigation relating to some of the issues that are also raised by the government's defenses and counterclaims. On June 7, 1993, the government receiver for Home, the Resolution Trust Corporation ("RTC"), filed a civil action against Messrs. Delapa, Derderian and Gladstone, ("the principals of AHB and Home") and other directors and officers of Home in the United States District Court for the District of Massachusetts. *RTC v. Gladstone*, Civil Action No. 93–11255–K (D.Mass. 1995) (hereafter the "D & O Litigation"). At the time the D & O Litigation was filed, the claims were owned by the RTC in its corporate capacity, as the result of a November 1990 Contract of Sale passing ownership of all claims against Home's former officers and directors from RTC as receiver to RTC in its corporate capacity.

The complaint in the D & O Litigation sought to recover damages from all of the defendants for negligence and breach of fiduciary duty in connection with Home's lending operations. The complaint also asserted fraud claims against Sumner Gladstone, alleging that he engaged in self-dealing and received kickbacks from a borrower. Most of the facts underlying the government's counterclaims and defenses in the present action involve the same transactions and alleged misconduct that were the subject of the D & O Litigation. *See RTC v. Gladstone*, 895 F.Supp. 356, 359, 361–62 (D.Mass.1995).

On May 4, 1994, RTC filed an amended complaint alleging damages of $50 million and alleging fraudulent misrepresentation, gross negligence, negligence *per se*, and imprudent, unsafe and unsound practices that caused Home's closing. *Id.*

On December 31, 1995, the RTC ceased to exist and all assets of RTC Corporate (including the D & O Litigation and Home's goodwill claims) passed by operation of law to the Federal Savings and Loan Insurance Corporation ("FSLIC") Resolution Fund ("FRF"), which is managed by the Federal Deposit Insurance Corporation ("FDIC"). The FDIC settled the D & O Litigation with Mr. Gladstone in 1999. On December 31, 2001, the FDIC settled the D & O Litigation with Messrs. Delapa and Derderian.

## II. FACTS RELATING TO AHB'S ACQUISITION OF HOME

The following facts were set forth in the defendant's counterclaim. The court assumes each well-plead factual allegation to be true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Owen v. United States*, 851 F.2d 1404, 1407 (Fed.Cir. 1988); *Chang v. United States*, 859 F.2d 893, 894 (Fed.Cir.1988).

Home, a Massachusetts stock savings bank, was a member of the Federal Home Loan Bank system and its deposits were insured by the FSLIC. The bank was subject to comprehensive regulation, examination and supervision by the Federal Home Loan Bank Board ("FHLBB").

In 1984, Home retained Drexel Burnham Lambert, Inc. ("Drexel") to explore merger possibilities. Drexel introduced Home to a group of individual real estate development investors that included Anthony Delapa, A. James Derderian, and Sumner Gladstone.

On August 2, 1985, AHB, a corporation formed by Mr. Gladstone, submitted an H-(e)1 application to FHLBB seeking approval to acquire Home.[2] AHB's application included confidential biographical and financial reports of Mr. Gladstone, Mr. Delapa, and Mr. Derderian. Written representations in two of these financial reports, setting forth Mr. Gladstone's financial condition, were falsely reported.

Specifically, these financial reports falsely stated that Mr. Gladstone was the 100 percent owner of Gladstone Brothers, Inc., with a fair market value of $22,817,689. In addition, the financial reports submitted by AHB failed to disclose Mr. Gladstone's personal liabilities of $2.5 million in cash payments owed to his estranged wife. Furthermore, these financial reports falsely stated that Mr. Gladstone was the 100 percent owner of three parcels of real estate worth $555,000 in the aggregate.

---

**2.** FSLIC Application H-(e)1 was required pursuant to Section 408(e)(1)(B) of the National Housing Act and Section 584.4(b) of the Regulations for Savings and Loan Holding Companies.

AHB submitted Mr. Gladstone's financial reports to FHLBB as exhibits to AHB's application to acquire control of Home. Mr. Gladstone signed each of his financial reports representing and warranting that the information contained within was "true, correct and complete." Furthermore, Mr. Gladstone and Mr. Derderian, together the controlling shareholders of AHB, each certified that the information contained in AHB's application was "true and correct to the best of his knowledge and belief."

In May 1986, FHLBB approved AHB's acquisition of Home by issuing Resolution 86–501, which set forth a number of conditions, including that AHB and Home: (1) agree to not engage in any transactions involving conflicts-of-interest; (2) notify regulators if any such conflict-of-interest transaction occurred; (3) provide "accurate and complete information in all applications, notices, filings or other documents filed" with the FHLBB; (4) adhere to certain loan underwriting requirements; (5) maintain Home's net worth at a specified capital ratio; and, implicitly, (6) operate Home in a safe and sound manner.

The funds utilized by AHB to acquire control of Home were obtained in part through funds borrowed by individual shareholders of AHB. Mr. Delapa and Mr. Derderian alone borrowed approximately $6.5 million to contribute their share of funds to AHB. On June 13, 1986, AHB's acquisition of Home became effective.

The honesty and integrity of the information contained in AHB's application was a fundamental concern of the regulators in approving the acquisition of any institution whose assets were insured by FSLIC. The financial condition of AHB's shareholders was a critical component in the regulators' assessment that AHB was a viable candidate to acquire Home. In approving AHB's acquisition of Home, Federal regulators relied upon the integrity, financial means and requisite expertise that AHB represented each shareholder possessed. Federal regulators who recommended the approval of AHB's acquisition of Home have uniformly stated that they would not have approved AHB's acquisition if they knew that AHB had submitted false information, specifically with respect to Mr. Gladstone's financial condition, in its application to acquire Home. Regulators considered the submission of false financial information to FHLBB, especially the type submitted here, to be a serious impropriety and sufficient cause alone for rejecting an applicant.

In addition, the FHLBB's approval of AHB's acquisition was expressly conditioned upon AHB's compliance with conditions outlined in FHLBB Resolution No. 86–501, including that AHB was "at all times, to file accurate and complete information in all applications, notices, filings or other documents filed with the Board." FHLBB Resolution 86–501's obligation to provide truthful information embodied obligations regulators discussed with AHB and among themselves.

### III.  FACTS RELATING TO AHB'S OPERATION AND MANAGEMENT OF HOME

Following AHB's acquisition of Home, each of the three shareholders of AHB, Messrs. Delapa, Derderian and Gladstone, were appointed as directors of Home. From November 1986, until April 1988, Mr. Gladstone served as Home's President and Chief Executive Officer ("CEO"). Mr. Delapa served as Home's President and CEO from April 1988, until June 1990, when the government, through the Office of Thrift Supervision ("OTS"), seized the bank.

Moreover, throughout their tenures as directors of Home, Messrs. Delapa, Derderian and Gladstone remained on Home's Executive Committee, which approved Home's commercial and acquisition, development and construction loans. In addition, Mr. Delapa served as a member of Home's Audit Committee during 1986 and 1987 and as a member of Home's Investment Committee during 1988 and 1989. Mr. Derderian also served as a member of Home's Audit Committee during 1988 and 1989 and as a member of Home's Investment Committee during 1986 and 1987.

At the time of the acquisition, Home had a traditional savings and loan asset base, comprised primarily of single family, fixed rate

mortgages. Soon after the acquisition, AHB embarked upon an aggressive program of commercial real estate lending, transforming Home from a traditional single family, fixed rate mortgage lender, into a thrift whose portfolio was predominantly comprised of more risky commercial real estate loans.

Just fourteen months after the acquisition, FHLBB's August 1987 Report of Examination ("ROE") concluded that the bank's overall condition was unsatisfactory, its lending standards weak, and its asset quality unacceptable. With assets of $125 million, approximately 42 percent of the assets were subject to criticism. FHLBB cited a breakdown in operating procedures, violations of Federal regulations, and ineffective oversight by the board of directors. On January 13, 1988, FHLBB notified AHB of its failure to (1) maintain proper corporate books and records; (2) establish requisite corporate committees; and (3) comply with all of the conditions of FHLBB Resolution 86–501.

In February 1988, FHLBB placed Home under the restrictions and conditions of a Supervisory Agreement. This agreement stated that Home had violated underwriting laws and regulations, engaged in unsafe or unsound practices, and that such violations and practices provided grounds for the initiation of cease-and-desist proceedings against Home. With the deterioration of the unsafe and unsound loans underwritten primarily after AHB's acquisition in 1986, Home's condition continued to deteriorate. FHLBB's September 1988 ROE stated that Home's condition was unsatisfactory, that AHB and Home were not operating the Bank in a safe and sound manner, and that Home had violated the terms of the February 1988 Supervisory Agreement and numerous other laws, regulations and memoranda. By the first quarter of 1989, Home had ceased most lending operations and instead was focused primarily on loan collection and work-out activities.

On August 9, 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103. Stat. 183, codified, in relevant part, at 12 U.S.C. § 1464. On December 7, 1989, the minimum capital requirements under FIRREA became effective. FIRREA permitted the inclusion of goodwill in core capital requirements in accordance with a five-year phase-out schedule. Pursuant to this phase-out schedule, Home could have retained approximately $3.6 million of goodwill in its core capital computations during the two-year period immediately following FIRREA's passage.

By the end of 1989, Federal regulators noted that the condition of Home had deteriorated to the point where it was no longer considered viable; it faced continued substantial losses and regulators determined that it would not be able to return to profitability. FDIC's December 1989 ROE largely attributed Home's problems to speculative commercial real estate assets booked after AHB's 1986 restructuring of Home. Moreover, FDIC concluded that Mr. Gladstone was unqualified to have administered the bank's affairs and that Messrs. Delapa and Derderian were responsible for allowing him to assume a dominant management role. OTS also cited Home's lack of adherence to the terms of the February 1988 Supervisory Agreement and cited violations concerning direct investment and conflicts of interest. Some forty-three apparent violations of twenty laws or regulations were cited in the OTS report.

On May 14, 1990, Home's management issued an audited financial statement, depicting Home's financial condition as of December 31, 1989 ("the 1989 Audited Financial Statement"). The 1989 Audited Financial Statement showed that Home's total stockholder equity as of December 1989, was negative $24 million, irrespective of Home's write-off of its goodwill. The 1989 Audited Financial Statement also showed that, during 1989, Home lost approximately $38 million, irrespective of its write-off of goodwill. It also showed that Home had a total of $71,967,000 in delinquent loans in 1989 and that the reserves set aside by Home for loan losses increased almost tenfold, from $2,638,510 in 1988 to $24,437,598 in 1989.

During 1989, Home became insolvent and its goodwill became impaired. Thus, Home wrote off *all* of its goodwill in 1989, even though FIRREA's phase-out schedule per-

mitted it to retain $3.6 million toward regulatory capital computations until January 1992, and lesser amounts until 1995. On June 8, 1990, OTS placed Home into receivership and named the Resolution Trust Corporation ("RTC") as receiver.

On December 3, 1990, AHB filed its original complaint in this case stating that it was seeking as its prayer for relief, "a total sum in excess of $14 million."

Between 1990 and 1992, OTS pursued an administrative enforcement action against the founder of AHB and President and CEO of Home, Mr. Gladstone, involving claims for: illegal kickbacks, improper insider payments at Home, the submission of false financial information in AHB's application to acquire Home, the illegal misappropriation and undisclosed use of Home's funds (including obtaining $49,000 for the purchase of a Jaguar automobile for Mr. Gladstone's personal use), unjust enrichment, improper payments by Home to third parties for Mr. Gladstone's personal benefit, and unsafe and unsound lending practices, including the violation of conflict-of-interest prohibitions. At the conclusion of its enforcement action, OTS issued an Order of Prohibition; Order to Cease and Desist, and Final Assessment of Civil Money Penalties to Mr. Gladstone. As a result, Mr. Gladstone was prohibited from participating in the banking industry for life and obligated to make payments of $185,000 in restitution and civil money penalties.

The transactions at the core of the OTS action against Mr. Gladstone included Mr. Gladstone's demand and receipt of kickbacks on loans given by Home to Forrest Sell, a New Hampshire developer. According to Mr. Sell, he paid Mr. Gladstone and others bribes and kickbacks of $25,000 to obtain loans from Home related to three of his projects known as South View Realty Trust ("South View"), Little Brook Village Realty Trust ("LBV") and Proctor Way.

All three of these loans to Mr. Sell were approved by Home's Executive Committee. Mr. Sell received commitments of up to $710,000 for LBV and $3.8 million for South View. At the time that these loan commitments were made, Home anticipated benefitting from these loans through its imposition of above-market interest rates. Both the South View and LBV projects ultimately failed, with Home's losses initially estimated at $920,000 due to the failure of these projects. Mr. Sell stated that, after Mr. Gladstone's repeated attempts to get him to pay an additional $25,000 kickback, Home withdrew the loan commitment on the Proctor Way project.

The conflict-of-interest transactions that Mr. Gladstone engaged in included, among others, Home's loans connected with First Bourne Realty Trust ("First Bourne") and the Woods At Frenchman's Creek ("Frenchman's Creek").

In October 1987, First Bourne obtained a loan from Home in the amount of $3.7 million for the development of a shopping center in Bourne, Massachusetts. First Bourne utilized Home loan proceeds to pay-off the existing balances of $632,297 on loans First Bourne obtained from a company, Camelot Court, owned by Home's President and CEO, Mr. Gladstone. First Bourne utilized the funds to acquire the land for the shopping center.

Mr. Gladstone, did not disclose his interest in the First Bourne property to Home's full board of directors or Federal regulators, despite having personally executed the document authorizing Home to grant the $3.7 million loan to First Bourne. The First Bourne project ultimately failed, causing a loss to Home initially estimated at $2.1 million.

The Frenchmen's Creek loans involve three categories of conflict-of-interest improprieties: the use of straw-borrowers to obtain loans with an undisclosed conflict of interest, the conversion of funds which should have been paid to Home, and the diversion of loan proceeds which should have been utilized to pay subcontractors. Between 1987 and 1989, Mr. Gladstone and Albert J. Winnier, a Florida developer, engaged in a scheme designed by Mr. Gladstone, acting in his capacity as Home's President and as a member of Home's Executive Committee, to cause Home to make loans that would enable Mr. Winnier to act as a straw-borrower and to purchase and develop,

using Home's funds, a 182–unit condominium project in Pinellas County, Florida. As Mr. Winnier testified, Mr. Gladstone planned thereafter to purchase the project from Mr. Winnier after compensating him $200,000 for his straw-man role.

In August 1987, a $6 million loan to Mr. Winnier was presented to and approved by the Executive Committee of Home. In addition, Home approved two other loans to Mr. Winnier in the amounts of $110,000 and $50,000. The loans for $6 million and $110,000 closed, and approval was given for the $50,000 loan, on or about Mr. Gladstone's last day as President of Home.

Mr. Winnier also entered into an agreement with G.C. Corporation ("G.C.Corp."), another company owned and operated by Mr. Gladstone, whereby it would market, lease and collect rent on the apartments. According to Mr. Winnier, G.C. Corp. was obligated to forward the pro-rata share of any rental revenues it received to Home to cover interest payments. Instead, Mr. Gladstone converted these revenues, estimated by Mr. Winnier to be $500,000, for his own use.

In September 1989, Mr. Winnier sold his interest in Frenchman's Creek to Woodside Builders, Inc. ("Woodside Builders"), a corporation controlled by Mr. Gladstone. Also in September 1989, Woodside Builders converted a construction draw of $113,000 from Home loan proceeds, intended for payment of subcontractors, for its own use. Mr. Winnier testified that other members of Home's Executive Board, including Mr. Delapa, serving as Home's President and CEO, knew about his arrangement with Mr. Gladstone concerning Frenchman's Creek, including Mr. Gladstone's receipt of rental income from Frenchman's Creek. Foreclosure proceedings on Frenchman's Creek began in January 1990, causing a loss to Home initially estimated at $4.6 million.

Because of FHLBB's interest in preventing conflict-of-interest violations, a management questionnaire designed to uncover such wrongdoing was regularly employed in connection with FHLBB periodic examinations. As part of FHLBB's periodic review process, Home was examined during September 1986, August 1987, September 1988, and December 1989. Part of this examination required Home to answer a FHLBB management questionnaire specifically designed, in part, to uncover any conflicts-of-interest violations, including 12 C.F.R. §§ 563.18, 563.35, 563.40, 563.41 and 571.7 violations, such as an illegal kickback scheme involving the CEO of a thrift.

For example, the questionnaire submitted by regulators as part of the August 1987 examination requested information concerning affiliated persons who had obtained an interest in a loan by the thrift, received any fee, rebate or benefit as a result of the thrift's financing of a loan, or had been involved in transactions with affiliated persons. Home's management responded with answers which were false, misleading and which omitted the various conflicts of interest, kickbacks and other fraudulent acts of the principals. Similar answers were provided by Home to questions from the management questionnaires submitted in connection with September 1988 and December 1989 ROEs.

## IV. *DISCUSSION*

### A. Consideration of Materials Outside of the Pleadings

Before addressing the merits of AHB's motion to dismiss, the court must first decide whether it will accept and consider the additional materials that the government has offered in support of its counterclaims. AHB has moved to strike those additional materials which go beyond the pleadings on the grounds that the only factual issues properly before the court on its motion to dismiss are those relating to jurisdiction, and not those issues relating to the merits of the government's counterclaims. The government, in response, has asked the court to convert its reply to AHB's motion to dismiss into a motion for summary judgment under Rule 12(b). RCFC 12(b) states:

> If, on a motion asserting the defense numbered [12(b) ](6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as

one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56.

The decision on which course to choose is a matter left entirely to the court's discretion. *See* Wright and Miller, 5A Fed. Prac. & Proc. Civ.2d § 1366 (2002). ("The court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion.") Given the voluminous materials presented by the government, and the numerous issues presented by AHB with respect to those materials, the court has decided that it will *not* consider any materials beyond the pleadings with respect to the government's response to AHB's Rule 12(b)(6) motion until the motion to dismiss is decided. Accordingly, for purposes of ruling on the present motion to dismiss, the court has excluded from its consideration of AHB's motion to dismiss under Rule 12(b)(6) all of the materials that were not identified as part of the government's answer and counterclaim. In light of the court's decision, AHB's motion to strike those portions of the government's response to its motion to dismiss is now moot.

## B. Standard of Review Under RCFC 12(b)(1) and 12(b)(6)

AHB asserts that the government's counterclaims should be dismissed for lack of subject matter jurisdiction under RCFC 12(b)(1) and for failure to state a claim upon which relief can be granted under RCFC 12(b)(6). The court, in reviewing a motion to dismiss a counterclaim under Rule 12(b)(6), as when reviewing a motion to dismiss a complaint under the same rule, must construe the allegations favorably to the pleader and must deny the motion if those facts reveal any possible basis upon which the pleader may prevail. *Jana, Inc. v. United States*, 34 Fed.Cl. 447, 449 (1995). *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("[A counterclaim] should not be dismissed for failure to state a claim unless it appears beyond doubt that the [claimant] can prove no set of facts in sup-

port of his claim which would entitle him to relief.") (footnote omitted). *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see also Chang v. United States*, 859 F.2d 893, 894 (Fed.Cir.1988).

The burden, however, is on the pleader to prove that the court has jurisdiction to hear its claims. *See Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991) ("A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists.") (citing *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183 (1936)). In this connection, the court must resolve any disputed facts relevant to the issue of jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988).

## C. AHB's 12(b)(1) MOTION

### 1. The Case Management Order Does Not Bar Defendant's Counterclaims and Defenses

█ AHB claims that the government's counterclaims and defenses must be dismissed for lack of jurisdiction based on the September 18, 1996 CMO governing certain procedures in this case. According to AHB, under the terms of the CMO, the government should have disclosed its fraud-related counterclaims and defenses at least four years ago. Failure to do so, AHB argues, constitutes a voluntary waiver of these counterclaims. AHB bases this argument on it reading of Section 5.d. of the CMO, which states:

> Within 120 days of the filing of a motion for partial summary judgment, ... the defendant shall set forth, in accordance with the requirements of the rules of this Court, any defenses of which it knows or has reason to know that can relate to the two issues asserted in the motion [whether a contract(s) existed...and whether the government acted inconsistently with that contract(s).] ...

AHB asserts that because AHB filed its short form motion on April 1, 1998, the government was required to disclose its counterclaims and affirmative defenses no later than July 31, 1998.

The government responds by asserting that all of the government's defenses and counterclaims were filed well before the time required by the CMO and its companion procedural orders. The government focuses its argument on the August 11, 1997 Procedural Order No. 1: Master Litigation Plan. Specifically, paragraph VI.A.I. states:

> Within 30 days after commencement of Phase II case-specific discovery in a case, the defendant shall file a response to the Complaint in accordance with the rules of this Court, unless a dispositive motion (including a partially dispositive motion) is pending. *In cases in which a dispositive motion is pending, the defendant shall file a response to the Complaint within 30 days after issuance of an Order resolving the motion, to the extent a response is necessary.*

(Emphasis added.) The government asserts that on April 1, 1998, the date when Phase II case-specific discovery commenced in this case, AHB's dispositive motion was still pending. The government therefore concludes that because liability issues are still pending, its defenses and counterclaims were filed well within the time required by the CMOs.

In further support of its position, the government notes *First Fed. Sav. Bank of Hegewisch v. United States,* 52 Fed.Cl. 774, 787 (2002), in which the court stated: "The court interprets the CMO to specifically grant defendant the opportunity to withhold filing its answer and counterclaims until after the short-form motions for partial summary judgment are decided."

The court agrees that the government's counterclaims and affirmative defenses are not barred under the CMO. While it is no doubt true that to the extent the defendant knew or had reason to know of a defense, the CMO contemplated that the defense should have been raised within 120 days of the filing of the short form motion for partial summary judgment. However, the CMO does not provide that the government's failure to do so results in a waiver of the government's counterclaims and defenses. It is clear from reading the entire CMO and subsequent orders that the government was not required to file an answer until after a liability ruling in the case, and that the government's counterclaims and defenses could not be waived until an answer was filed. Accordingly, the court finds that the government's defenses and counterclaims are timely.

Moreover, as AHB recognizes, the court has broad discretion to allow new claims and defenses to be added to a case before the resolution of the litigation in any event. *See Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Tenneco Resins Inc. v. Reeves,* 752 F.2d 630, 635 (Fed.Cir.1985). In deciding whether to permit any such addition, the court must consider any prejudice to the opposing party. *Zenith* at 330–31, 91 S.Ct. 795. Here, AHB argues that it will be prejudiced by the court allowing the government to assert its counterclaims and defenses because of the government's concealment of its counterclaims and defenses. AHB argues that the government has known for years the underlying bases for the government's fraud claims and has wrongfully failed to reveal these claims.

The court does not agree that the government wrongfully concealed its intentions to assert fraud defenses. To the contrary, AHB has known for years that issues of fraud have been lurking in background of this case. AHB had been very much involved in the D & O Litigation that adduced most of the facts supporting the government's fraud claims. Indeed, AHB was a party to the settlement agreement resolving the D & O claims in December 2001. In such circumstances, the court does not find AHB's arguments regarding prejudice persuasive. AHB understood that there were serious fraud issues associated with AHB's acquisition of Home and Mr. Gladstone's operation of Home once it was acquired. It should have come to no surprise to AHB, following the settlement of the D & O Litigation that those same issues might be raised in the pending litigation in defense to AHB's breach of contract and other claims. The court, therefore, will now turn to the other claims in AHB's 12(b)(1) motion.

### 2. Defendant's Counterclaims Are Not Barred by the Six–Year Statute of Limitations

#### a. Special Plea in Fraud Counterclaim

██ AHB contends that even if the government's Special Plea in Fraud is not barred by the CMO, it is time-barred under the six-year statute of limitations set forth in 28 U.S.C. § 2501. AHB argues that the general six-year statute of limitations for claims brought *against* the United States, pursuant to 28 U.S.C. § 2501, also applies to a Special Plea in Fraud, which is a claim brought *by* the United States. AHB asserts that two U.S. Court of Federal Claims cases decided by the same judge are dispositive: *TS Infosystems, Inc. v. United States*, 36 Fed.Cl. 570 (1996) and *SGW, Inc. v. United States*, 20 Cl.Ct. 174 (1990). In both cases, the Court stated that the general six-year statute of limitation under § 2501 governs counterclaims brought pursuant to 28 U.S.C. § 2514. *TS Infosystems*, 36 Fed.Cl. at 574; *SGW*, 20 Cl.Ct. at 181. AHB, therefore, argues that because more than six years have expired since the government's discovery of the alleged fraud, the government's special plea is untimely.

The government responds that the better view is that the Special Plea in Fraud under § 2514 is not subject to the six-year statute of limitations set forth in § 2501. *Jana, Inc. v. United States*, 34 Fed.Cl. 447, 451 (1995) ("*Jana I*") (citing *Erie Basin Metal Prods. v. United States*, 138 Ct.Cl. 67, 150 F.Supp. 561, 566 (1957)); *Hegewisch*, 52 Fed.Cl. at 788; *Goggin v. United States*, 138 Ct.Cl. 279, 152 F.Supp. 78, 81 (1957); *see also Jana v. United States*, 41 Fed.Cl. 735, 737 (1998) ("*Jana II*"). The government argues that *TS Infosystems* and *SGW* were wrongly decided. According to the government, the only potentially applicable statute of limitations for contract claims brought *by* the United States, is 28 U.S.C. § 2415(a); however, Section 2415(f) expressly provides that the six-year limitation on such actions does not prevent the assertion of any claim "of the United States ... against an opposing party

... that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." 28 U.S.C. § 2415(f). It is not disputed that the government's counterclaims here arise out of the same alleged contract from which AHB's claim arises—*i.e.*, the acquisition, control and management of Home, a federally-insured thrift. Thus, the government asserts that its forfeiture counterclaim is not subject to any limitations period. *See Jana I*, 34 Fed.Cl. at 452.

The court agrees with the government. The court finds that when 28 U.S.C. § 2501 is read in light of 28 U.S.C. § 2415, there is no statute of limitations applicable to the government's Special Plea in Fraud counterclaim. In this connection, the court agrees with the *Hegewisch* court that applying a six-year limitations statute to a Special Plea in Fraud counterclaim "would greatly restrict this important defense designed to protect the government from fraudulent claims." 52 Fed.Cl. at 787. Consequently, the court finds that there is no statute of limitations barring the Special Plea in Fraud counterclaim in this case.[3]

#### b. Rescission Counterclaim

AHB asserts that the government's counterclaim seeking rescission is also subject to the six-year period of limitations contained in 28 U.S.C. § 2501. AHB notes that the government's claim is brought almost twelve years after AHB filed this suit seeking to recover damages for the government's alleged breach of contract. AHB argues that, "the government must exercise the right to avoid the contract within a reasonable time of learning that it is tainted by wrongdoing. The failure to do so results in the loss of the right of avoidance." *Godley v. United States*, 26 Cl.Ct. 1075, 1081 (1992), *rev'd on other grounds* 5 F.3d 1473 (Fed.Cir.1993).

The government argues that AHB's contention that the government has waived its right to rescind because it failed to seek rescission at an earlier time is wrong. The government contends that where, as here, the contract was illegally obtained "the pur-

---

**3.** The court disagrees with AHB's contention that the Special Plea in Fraud counterclaim is not a compulsory counterclaim. To the contrary, it is

clear that it has been raised specifically in response to AHB's claim for damages in this case and would not stand as an independent action.

ported contract with the Government is void *ab initio*," and therefore the government did not need to seek rescission within a specific time. According to the government, rescission occurs, as a matter of law, in that a void contract cannot be ratified, or otherwise resurrected. *See J.E.T.S., Inc. v. United States,* 838 F.2d 1196, 1200 (Fed.Cir.1988); *see also Godley,* 5 F.3d at 1474–76. In such circumstances, the government contends that the government could not waive its right to rescind.

In effect, the government is arguing that because the contract between AHB and the government is void, it never existed and thus could not have been breached and given rise to a right to damage. The court agrees. The government could not waive its right to rescind the contract, because if the government can prove fraudulent inducement, the contract was rescinded as a matter of law. The government's rescission counterclaim is nothing more than an assertion of that legal fact. Thus, to the extent that the government is able to establish "fraudulent inducement," the government's rescission claim will be subsumed into its Special Plea in Fraud counterclaim for forfeiture. The rescission counterclaim is not barred by any statute of limitations for the same reason that the Special Plea in Fraud is not barred by any limitations period.

## D. AHB's 12(b)(6) MOTION

In its Special Plea in Fraud counterclaim, the government alleges two separate periods of fraud: the first involves AHB's alleged fraud in securing the acquisition of Home; the second involves allegations of fraud in the management and operation of Home. For the following reasons, the court finds that the government has stated a claim for which relief may be granted with respect to AHB's alleged fraud in securing the acquisition of Home. AHB's motion to dismiss the government's Special Plea in Fraud counterclaim under RCFC 12(b)(6) is, therefore, denied.

### 1. The Government Has Stated a Claim Under the Special Plea in Fraud Statute Based Upon the Acquisition of Home

■ The government alleges that AHB's action must be forfeited because of the fraud AHB committed against the government in connection with obtaining the government's permission to acquire Home. In particular, the government alleges that AHB submitted an application to the government which contained false information with respect to Mr. Gladstone's financial condition. The government charges that federal regulators relied upon that false information when they approved AHB's acquisition of Home, and that they would not have approved AHB's application if they had known the correct facts. The government further alleges that the government was injured by allowing AHB to acquire Home because the management AHB put in place to run Home engaged in multiple conflict of interest violations. The government asserts that the court must impute the false statements made by Mr. Gladstone on his financial statements to AHB on the grounds that the false statements were attached as exhibits to AHB's application to acquire Home, and because Mr. Gladstone, as the founder of AHB and a major shareholder of AHB, certified, on behalf of AHB, that the information contained in AHB's application was true and correct.

The government contends that these allegations satisfy the elements of a Special Plea in Fraud, which requires the government to " 'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.' " *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1379 (Fed.Cir.2001) (quoting *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir. 1998)). *See Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042 (Fed.Cir.1994). The government also contends that these allegations satisfy the elements of common law fraud, which require that the government prove by clear and convincing evidence: (1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *See J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,*

747 F.2d 1553, 1559 (Fed.Cir.1984).[4]

Further, the government contends that it has alleged a sufficient basis for the court to impute Mr. Gladstone's fraud to AHB. The government states that under the law of this Circuit, it is well-established that "a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible for their acts." *Wagner Iron Works v. United States,* 146 Ct.Cl. 334, 174 F.Supp. 956, 958 (1959); *accord Anderson v. United States,* 47 Fed.Cl. 438, 448 (2000). Here, the government argues that it has alleged sufficient facts to impute the fraud committed by Mr. Gladstone, in submitting false financial statements as part of AHB's Home application, to AHB. Mr. Gladstone submitted the statements as a shareholder of AHB in order for AHB to obtain government approval of its application and further certified—as one of the principal shareholders, president, and CEO of AHB—that the information contained in the AHB application was "true and correct to the best of his knowledge and belief." Defendant's answer ¶ 107.

In its response, AHB does not take issue with any of the government's factual assertions, but states that as a matter of law the government's alleged facts fail to state a claim because the government cannot impute the actions of Mr. Gladstone to AHB. AHB argues that absent allegations that Mr. Gladstone's financial statement was "shared with other AHB investors" there was no way for AHB to know that the statements were false and thus "warranting the truth of the information in the financial statements was a personal action by each investor, not an action undertaken in his capacity as a representative of AHB." AHB Br. at 8. In such circumstances, AHB contends, Mr. Gladstone's actions cannot be imputed to AHB.

The court finds that the government has alleged sufficient facts, which if proven, would allow the court to find that Mr. Gladstone committed fraud by submitting false financial statements to the government in support of AHB's application to acquire Home. In addition, the government has alleged sufficient facts to impute Mr. Gladstone's actions to AHB. The government alleges that Mr. Gladstone submitted the false financial statements because he was a significant shareholder in AHB and would thereby be required to support AHB's financial commitment to Home, if the application were approved. In addition, the government states that Mr. Gladstone was the president and CEO of AHB, and further that Messrs. Gladstone and Derderian, as the controlling shareholders of AHB, certified that the "AHB application" was "true and correct to the best of [their] knowledge and belief." Defendant's Answer ¶ 107. These actions, if true, were plainly taken by Mr. Gladstone on behalf of and for the benefit of AHB. *See Wagner,* 174 F.Supp. at 958. *See also* Fletcher Cyclopedia of Private Corp. § 790 (2002) ("[A] corporation is charged with constructive knowledge [of it's agent's actions], regardless of its actual knowledge ... even though the officer or agent does not in fact communicate the knowledge to the corporation.") (Footnotes omitted.) In such circumstances, Mr. Gladstone's actions can be imputed to AHB. Accordingly, AHB's motion to dismiss the Special Plea in Fraud counterclaim based on the alleged fraud committed in AHB's acquisition of Home is denied.

## 2. The Government Has Not Stated a Claim Under the Special Plea in Fraud Statute Based Upon the Operation and Management of Home

The government also supports its Special Plea in Fraud with allegations of fraud in connection with the control and management of Home by Messrs. Gladstone, Delapa and Derderian. The government argues that Messrs. Gladstone, Delapa and Derderian, as the principals of both AHB and Home, had obligations directly to both AHB and Home; and that AHB is therefore liable for their improper actions. More specifically, the government devotes a substantial portion of its counterclaim to allegations of Mr. Gladstone's self-dealing and receipt of kickbacks

4. AHB contends that these same four elements must be established to prove fraud under the Special Plea in Fraud statute. Because the government's allegations satisfy both tests, it is not necessary to finally resolve that legal issue here.

during his tenure as an officer and director of Home. The government asserts that Mr. Gladstone's demand and receipt of bribes and kickbacks, in connection with three projects by a Mr. Sell, violated the conflict of interest prohibitions in the government's resolution approving AHB's acquisition of Home. The government asserts that "the demand and receipt of kickbacks while AHB was in control of Home constitutes fraud in the performance of the purported contract."

The government also alleges that AHB is responsible for other improper transactions involving Mr. Gladstone. In particular, the government alleges that Mr. Gladstone violated various conflict of interest provisions by providing loans to the First Bourne Realty Trust and the Woods at Frenchman's Creek. The government states that Mr. Gladstone "did not disclose his interest in the First Bourne property to Home's full board of directors or Federal regulators." According to the complaint, Mr. Gladstone also failed to disclose his interest in the Frenchman's Creek project, in violation of the conflict-of-interest provisions of AHB's purported contract with the government. The government asserts that Mr. Delapa was aware of Mr. Gladstone's improper activities with respect to Frenchman's Creek.

Finally, the government alleges that the actions of Mr. Gladstone, Mr. Delapa and Mr. Derderian, as principals in Home, in submitting false statements to the federal regulatory authorities amounts to fraud by AHB. The government argues that AHB is properly tied to these fraudulent acts, because, at the time these individuals were officers or directors of Home, these individuals were also the shareholder-owners of AHB. In short, the government argues that when these individuals acted on behalf of Home, they also acted on behalf of AHB.

AHB argues in response that the government cannot state a basis for relief under the Special Plea in Fraud statute based on Mr. Gladstone's actions while an officer of Home. AHB also argues that the alleged improper actions of Mr. Delapa and Mr. Derderian in submitting allegedly false reports to the regulatory authorities does not require forfeiture of AHB's claim. AHB argues that the

law does not allow the court to automatically impute to AHB, actions taken by these individuals while serving as officers and directors of Home. AHB contends that the court may not engage in a "double imputation" from Messrs. Gladstone, Delapa and Derderian to Home and then from Home to AHB. AHB argues that the actions of Home were separate from AHB; Home had its own separate existence, and AHB was simply a stockholder. While AHB admits that it had the authority to select Home's board of directors, AHB asserts that as a matter of federal law, "only Home's officers and directors—not AHB—could control and operate Home." AHB Reply Br. at 15. Because AHB did not direct Home's activities, the actions of Home's officers and directors cannot be imputed to AHB.

AHB also argues that under both Massachusetts law and federal common law, where, as here, the alleged fraud had been concealed from the corporation, "the Government has failed to allege any facts to support its double imputation of Gladstone's alleged fraud to Home and from Home to AHB." More specifically, AHB asserts that Massachusetts law governs whether to pierce the corporate veil and that relevant law dictates that, "Massachusetts is stricter than other jurisdictions in respecting corporate identity." *See Birbara v. Locke*, 99 F.3d 1233, 1239 (1st Cir.1996). AHB further explains:

> Common ownership of two or more corporations, together with common management, standing alone, will not render the second corporation (here AHB) liable for wrongful acts of another corporation (Home) or its officers, directors, or employees (Gladstone). Sometimes, however, additional facts may exist that warrant imputing the misconduct of an officer, director, or employee (Gladstone) of the first corporation (Home) to the second corporation (AHB), but such facts require a *confused intermingling of the corporate entities* resulting in "some fraudulent or injurious consequence *of the intercorporate relationship.*"

*Id.,* quoting *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748, 751–52 (1968) (emphasis added).

AHB next argues that even if the court finds that Massachusetts law does not control, and that federal law should govern the imputation question, the court would rule that imputation of Mr. Gladstone's actions to AHB is inappropriate. AHB notes that in the *Hegewisch* case, the court concluded that misconduct by the institution's chief financial officer would not be imputed to the institution under federal law because the officer was not acting to benefit the corporation:

> If the employee is acting *outside of his or her actual or apparent authority*, for example, the corporation is generally not liable for said actions. In addition, many courts follow the rule that if the employee's actions are *adverse to the corporation's interests*, and the *corporation does not benefit* from said actions, the corporation is not liable for them.

*Hegewisch*, 52 Fed.Cl. at 791 (citations omitted) (emphasis added).

AHB contends that imputation is only proper where the alleged fraud is not adverse to the corporation or is for the benefit of the corporation. *See Long Island Savings Bank v. United States*, 54 Fed.Cl. 607, 618–19 (2002) ("[F]or there to be strict imputation, the Government must establish that indeed the perpetrator of the fraud acted on behalf of the corporate entity, and not merely for his personal benefit.")

The government argues in response that federal law does not require the government to show that the fraud benefitted the corporation or was not adverse to the corporation, in order to impute the fraud of corporate officers to the corporation. *Wagner*, 174 F.Supp. at 958; *see also Anderson*, 47 Fed. Cl. at 448. To the extent that *Hegewisch* and *Long Island* hold otherwise, the government argues that those cases were wrongly decided. The government argues that AHB, in this case, is in very much the same situation as the bank acquirer in *Anderson*. In *Anderson*, the court held that the Special Plea in Fraud statute barred the claims of the individuals who acquired a thrift for actions taken by those same individuals while they ran the thrift. The *Anderson* court held that the contract between the acquirers and the government included the obligation of the acquirers to run the acquired thrift in a sound manner. Thus, in *Anderson*, the court held that the acquirers' illegal actions barred their *Winstar*-related claims. The government argues, that AHB's claims should face the same fate as the acquirers' claims in *Anderson*.

The government argues, in the alternative, that AHB "indirectly" received the benefit of the interest income from Mr. Gladstone's conflict-of-interest loans and also benefitted from Home's officers' misrepresentations to the regulatory authorities by making false reports. According to the government, the false regulatory reports allowed Home to remain open, and, therefore, AHB "indirectly" benefitted from those false reports.

The court finds that the government has failed to allege sufficient facts to support a Special Plea in Fraud counterclaim against AHB, based on allegations relating to the operation and management of Home. While the government has certainly alleged sufficient facts to show that Mr. Gladstone committed fraud during his tenure as President of Home, the government has not alleged sufficient facts to impute Mr. Gladstone's actions to AHB. The government argues that Mr. Gladstone, as a principal of both AHB and Home, had obligations to both, and thus his actions can be imputed to both. However, the court finds that before it can impute actions taken by Mr. Gladstone as an officer of Home to AHB, the government must allege certain facts that are presently absent from its counterclaim.

■ To begin, in order to maintain an action against a parent corporation for the acts taken by officers or directors of its subsidiary, well-settled principles of corporate law come into play. As the Supreme Court recently explained in *United States v. Bestfoods*, "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citing Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929)). This is even

true where the directors of the parent corporation and the subsidiary are the same. *Id.* at 69, 118 S.Ct. 1876. However, a parent corporation may be held liable under both state and federal common law if it abuses the corporate form to accomplish wrongful purposes, such as fraud on the corporate parent's behalf. *Id.* at 62, 118 S.Ct. 1876.

■ Tested by these standards, the government has not pled sufficient facts to support a Special Plea in Fraud claim against AHB for the actions taken by Mr. Gladstone, as president of Home. Even if the court were to assume that the actions of Mr. Gladstone can be imputed to Home,[5] the government has not alleged that Mr. Gladstone's actions were taken to benefit AHB. To the contrary, the alleged facts demonstrate that Mr. Gladstone acted for his own benefit and endeavored to hide his conduct from others. Indeed, the counterclaim alleges that Mr. Gladstone's actions cost Home and thus, indirectly, AHB (Home's owner) millions of dollars. In such circumstances, the government has failed to plead sufficient facts to survive AHB's motion to dismiss the Special Plea in Fraud claim based on the acts of Mr. Gladstone, as an officer of Home.

The government's reliance on *Wagner, O'Brien,* and *Anderson,* to suggest that the court should not apply the "adverse interest test," or require a showing of a benefit to AHB, is misplaced.[6] Those cases exemplify an exception to the general rule of imputation in cases where the corporation and individual are essentially one in the same.[7] In cases where the wrongdoing is committed by an individual who controls the corporation, any action taken by that individual for his personal benefit is, in fact, taken to benefit the corporation. *See* 10 Am.Jur.2d Banks and Financial Institutions § 401 ("The prevailing rule does not recognize the exception to the general rule of imputation of knowledge when the officer or agent who is acting adversely or fraudulently is the sole representative of the bank; in such case, the rule adopted is that the knowledge of the sole representative of the bank becomes the knowledge of the bank by imputation.") *See also American Nat'l Bank v. Miller,* 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310 (1913); *Munroe v. Harriman,* 85 F.2d 493 (2nd Cir. 1936).

The government has not, however, alleged sufficient facts to invoke exception to the general rule of imputation in this case. Mr. Gladstone is not identified as the controlling or majority shareholder in either Home or AHB. In contrast to the cases relied upon by the government, Mr. Gladstone was not the "sole" owner of either corporation; nor was Mr. Gladstone the "controlling" shareholder of AHB. In such circumstances, the court finds that the application of the exception to the general rule on imputation is not available.

Finally, the government's contention that both Mr. Gladstone and Mr. Delapa, who is

---

5. It is not certain that the government has alleged sufficient facts to hold Home responsible for Mr. Gladstone's actions. The facts set forth in the counterclaim describe activities by Mr. Gladstone that were adverse to Home's interests and thus Home would not be liable for Gladstone's actions. *See F.D.I.C. v. Ernst & Young,* 967 F.2d 166, 171 (5th Cir.1992).

6. AHB's contention that Massachusetts law regarding the standards for imputation misses the mark. At issue here is when, under the Special Plea in Fraud statute, the actions of corporate officers and directors can be imputed to the contracting entity. This is a matter of federal law. *See O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Hegewisch,* 52 Fed.Cl. at 792 n. 30 (citing *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943)); *Boyle v. United Techs. Corp.,* 487 U.S. 500, 504, 108 S.Ct. 2510, 101

L.Ed.2d 442 (1988); *Prudential Ins. Co. of America v. United States,* 801 F.2d 1295, 1298 (Fed. Cir.1986); *Sam Gray Enters., Inc. v. United States,* 43 Fed.Cl. 596, 600 (1999) (quoting *Clearfield Trust,* 318 U.S. at 367, 63 S.Ct. 573).

7. *Anderson,* 47 Fed.Cl. at 448 ("David L. Paul was not just an officer 'clothed with the authority to act;' he, as CEO, Chairman of the Board and majority shareholder, in effect, controlled [the corporation.]") *O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666, 672 (1979) ("His fraud, that of the plaintiff's president, chief executive officer and substantially sole owner of the corporate stock, is of course imputed to the plaintiff corporation.") *Wagner,* 174 F.Supp. at 958 ("They were president and vice president ... and controlled the Board of Directors. They were, in fact, the corporation and, therefore, their fraud is the corporation's fraud.")

alleged to have learned of one of Mr. Gladstone's schemes, lied to the federal regulatory authorities by not disclosing Mr. Gladstone's fraud, does not alter the court's conclusion that the government has not supported a claim based on the Special Plea in Fraud statute. Again, the government has failed to allege sufficient facts to show that Mr. Gladstone's acts while managing Home were not adverse to AHB's interest or benefitted AHB.[8] Absent allegations to show that the fraud benefitted AHB, the court cannot impute Messrs. Gladstone's and Delapa's failure to disclose Mr. Gladstone's fraud to AHB.[9]

### E.  DEFENDANT'S RESCISSION COUNTERCLAIM

The government relies on the same facts regarding AHB's fraud in the acquisition of Home to support its rescission claim. As discussed above, the court finds that the government's recession claim is, in effect, subsumed into the Special Plea in Fraud but may remain as an independent claim. Rescission, therefore, is simply another potential remedy available to the government if it prevails on its Special Plea in Fraud claim, in connection with AHB's acquisition of Home. Because the court has found that Mr. Gladstone's fraudulent actions on behalf of AHB to acquire Home can be imputed to AHB, the rescission claim based on those same facts may remain.

### V.  *CONCLUSION*

Based on the foregoing, the court hereby **GRANTS IN PART** and **DENIES IN PART** plaintiff's August 15, 2002 motion to dismiss

or strike defendant's counterclaims and affirmative defenses. In addition, the court hereby **GRANTS IN PART** and **DENIES IN PART** plaintiff's October 28, 2002 motion to strike portions of the government's opposition to AHB's motion to dismiss counterclaims and affirmative defenses.

The government will have 30 days from the filing of this opinion to file an appropriate motion for summary judgment on the aspects of its counterclaims that have not been dismissed. AHB will have 30 days thereafter to reply.[10]

---

8. The government's contention that AHB benefitted from Messrs. Gladstone and Delapa's lies to regulators, simply because by lying Home remained open for business, is not a sufficient argument to state a claim for fraud to be imputed to AHB. The government has not alleged sufficient facts to show how keeping Home open, thereby losing money, yielded a benefit to AHB.

9. Having concluded that the actions of Mr. Gladstone and others in connection with their operation and management of Home do not establish a proper predicate for the government's Special Plea in Fraud claim, the court does not reach any of AHB's arguments regarding the preclusive effect of the prior D & O Litigation on this case.

To the extent that AHB believes that the D & O litigation also bars the government's Special Plea in Fraud claim with respect to AHB's acquisition of Home, it may raise that argument in response to the government's motion for summary judgment on that issue.

10. Because the portions of the Special Plea in Fraud claim have been dismissed without prejudice, the government may, at an appropriate time, move to file an amended counterclaim. Should the government move to file an amended counterclaim, the court will not entertain any such motion until after resolution of the government's Special Plea in Fraud claim based on AHB's acquisition of Home.